EZRA S. EATON & others, executors, *vs.* ELLA F. EATON.

Essex.    January 20, 21, 24, 1919. — June 30, 1919.

Present: RUGG, C. J., LORING, CROSBY, & CARROLL, JJ.

*Equity Jurisdiction,* Suit by executor named in unproved will to enjoin contest in violation of antenuptial agreement, Specific performance. *Contract,* Antenuptial agreement, Construction, Implied, Performance and breach. *Husband and Wife. Equity Pleading and Practice,* Requests and rulings, Exceptions.

A suit in equity may be maintained to enjoin the widow of a testator from contesting the proof of his will, if by so doing she violates the provisions of an antenuptial agreement between herself and the testator which was fully performed by him.

Where in an antenuptial agreement a man agrees with a woman whom he is intending to marry to provide by his will that she shall have a certain portion of his estate and she agrees to accept that portion in full of dower and of other rights which otherwise she might claim from his estate, there is an implied term of the agreement that, if the man fully performs all that the agreement requires of him, the woman will not contest the proof of a will made by the man in performance of the agreement.

One named as executor of a will made in performance of an antenuptial agreement of the character described above, in case the widow undertakes to contest the proof of the will, has sufficient interest to maintain a suit in equity to enjoin such contest although he has not yet been appointed executor.

Where a man and a woman, who are about to become husband and wife, undertake to establish by contract their respective property rights in the estate of the first to die, while the contract is to be construed according to its words, the parties do not stand at arm's length toward one another, and their relation is such that they are held to reasonableness and good faith toward one another in its performance.

While a man, who has entered into an antenuptial agreement with a woman, who becomes his wife, to give to her by will a proportional part of his estate, may make gifts during his life without breaking such agreement if the gifts are made in reasonableness and good faith toward his wife, having regard to all the circumstances, he cannot make gifts, either absolutely, conditionally, indirectly or otherwise, for the main purpose of defeating the provisions of the agreement and of preventing it from operating for the wife's benefit.

A widower with three sons made with a woman whom he was about to marry an agreement which provided that he by his will, after legacies and bequests which should not exceed a certain percentage of his estate, should divide the

rest of his estate into equal parts, one more in number than he left children or issue of deceased children surviving him, and that one of such parts should be given to each such child or issue of a deceased child and one part to his wife, her part to be held in a trust. Some years after the marriage, he became estranged and lived apart from his wife and his mind was centered upon the predominant purpose of so dealing with his property as to increase in so far as possible the share of his sons therein in rectification of what he considered the financial wrong done to them by the antenuptial agreement. Accordingly previous to his death he made various dispositions of his property for his sons' benefit, giving them large portions of it. The final form of his will provided for a trust of one fourth of the residue of his estate for the benefit of his wife, the language following substantially the language of the antenuptial agreement. The widow contested the will. The persons named as executors in the will brought a suit in equity to enjoin her from prosecuting her contest and from urging a petition for a widow's allowance, and to have specific performance of the antenuptial agreement ordered. The suit was heard by a single justice, who ordered that it be dismissed. Upon exceptions by the plaintiffs it was *held*, that a finding was warranted that the husband had not carried out the antenuptial agreement with reasonableness and good faith, and that the suit must be dismissed.

BILL IN EQUITY, filed in the Supreme Judicial Court on November 13, 1917, by those named as executors in the will of Charles S. Eaton, late of Marblehead, which will had been filed for probate but proof of which was being contested by the testator's widow, the defendant, to enjoin the defendant from prosecuting such contest and a petition for a widow's allowance and to compel her specifically to perform the antenuptial agreement between herself and the testator, described in the opinion.

Proceedings as to a demurrer of the defendant and the effect of a waiver by the defendant of an appeal from an interlocutory decree overruling that demurrer are described in the opinion.

The suit was heard on its merits by *Braley*, J., who filed a memorandum of findings of fact and rulings of law, substantially as follows:

The testator, about fifty-three years of age, and the defendant, then Ella F. Bartlett, about thirty-eight years old, of Pasadena, California, after mature consideration agreed out of mutual esteem and affection to become husband and wife. The marriage, which followed on July 4, 1909, was the third marriage of the defendant, who was childless. The testator, a man of unusual business ability and of more than average literary accomplishments as well as of great foresight and determination in accomplishing whatever he set his hands to, had established a restaurant

on Washington Street in Boston, known as "Thompson's Spa," of which he was the sole proprietor at the date of his marriage and continued so to be until the formation of the partnership hereafter referred to. The income from the business at the time of the engagement to marry and thereafter until the testator's death averaged at least $100,000 a year. The testator's other property appears approximately to have been in value about $180,000. In contemplation of the approaching marriage an antenuptial agreement was executed on July 3, 1909. The conception of having such an agreement was the testator's. "I have no reason to doubt the testimony of the defendant that the testator '. . . asked me if I would mind signing a contract whereby I would take one quarter of his property instead of one third, which was a wife's dower rights. He went on at some length why he wanted me to do this. He said his sons were about to marry, he feared that they were acquiescing because they wanted his consent to their marriage, and probably after they were married they might not be so well satisfied. He wanted them to have the very best opinion of me, he wanted them to feel I was willing to share everything with them. He asked me if I would mind signing this agreement. I said I had full confidence in him, if I had not I would not marry him; that whatever he asked me to sign I should think it was right; that I wanted the sons to realize I was sharing everything with them, if it would make any of them any happier I was more than willing to sign it.' It is conceded by the defendant's counsel that there was 'entire fairness in the making of the agreement.'" The material provisions of this agreement are described in the opinion.

"The instrument provides and it was the intention of the parties to provide for subsequently acquired property as well as the property then owned by the testator and such subsequently acquired property follows the limitations of the agreement the same as the property then owned by the testator. . . . Of course the defendant took the chances of altered business or financial conditions or of accidents to her husband's fortune which might occur before his death and reduce him from affluence to poverty. It is to be observed, however, that no power of revocation is reserved to the testator, but, having chosen to restrict himself in the manner described, he is bound by the restrictions. . . .

The agreement was to come into operation at his death and by reference to the inventory of his estate it is certain that the estate he leaves by his will, if in good faith he performs the agreement, is the estate of which the defendant is to have a one quarter share. The will, *prima facie* proof of which was introduced, in so far as it purports to carry out the agreement," did so in Article 4, the material provisions of which are described in the opinion.

"It is the contention of the plaintiffs, on whom rests the burden of proof, that by these provisions the testator has fully performed the agreement. The defendant, however, contends, and introduced evidence to show, that the testator intentionally violated the agreement by giving during his lifetime to his sons a very large and substantial part of his estate. That he transferred to them in one form or another a very large amount of property there is no question. The transactions relied on by the defendant are his dealings with the property in California, referred to in the evidence and herein as the Pasadena property, his gifts of money and transfer of securities to and the formation of a partnership with [two of his sons,] Ezra S. and Malcolm H. Eaton, giving to them at first a one seventh and later a one sixth interest in the spa and entering into a contract, which bound him and his estate and in which contract Ezra S. and Malcolm H. joined, to transfer to Charles F. Eaton, [his third son,] at first a one seventh and later a one sixth interest, whereby at his death there was actually left in his estate a one half interest in the business upon performance of the agreement with [the son] Charles. It becomes necessary before taking up these transactions in their order to refer somewhat briefly to the marital relations of the testator and the defendant, for all the acts complained of followed upon their separation.

"I find that the testator made valuable gifts of jewelry to his wife but in amount they were not beyond nor inconsistent with his income and, while they lived here and when abroad during their foreign tours in a most generous way, the expenditures, whatever their nature or however large, were made or sanctioned by the testator, who at all times had a mind of his own and commanded an ample income. I am unable to say, apart from his discharge of the mortgage on her house, that he made any other gifts; and, while her clothing doubtless was costly, the testator never

seems to have complained that she dressed beyond his means or in a style or manner unbecoming her station in life as his wife.

"For some years before his marriage the testator spent his winters in Pasadena, California, and it was there that he first met Mrs. Bartlett. The testator, having bought ar eligible lot, erected and furnished a mansion house, the design and furnishings of which seems to have been a project joined in by both. The house and its furnishings cost a large amount of money; but I am not impressed with the argument that the testator, by the overmastering domination of his wife, was compelled to build this house on the scale of magnificence shown. His entire history as revealed by the evidence shows that he was not a man to be dominated against his will by anybody.

"During the winter of 1913–1914 they were living in this house as their home when he became ill, suffering, as it turned out, from some form of cardiac disease, which seems ultimately to have caused his death. I am satisfied that up to this period, despite some occasional matrimonial differences which had been adjusted, there was no thought on the part of either of a possible and final separation. But the testator's physical condition, accompanied as it was with great nervousness and occasional and severe physical prostration, caused him to be irritable and exacting, and friction began to develop between them, until in March, 1914, acting on the advice of his physician but in accordance with his own wishes and will, he left his home and went to a local hospital for treatment, where he remained until May 5, 1914, when, without having seen his wife, who remained at the house and by his orders had been denied access to him, he took the train, accompanied by his son Ezra S. Eaton, for Marblehead. The parties never met again as husband and wife, although much correspondence ensued between them.

"In his letter of July 4, 1914, he wrote his wife, 'It is my wish and intention to treat you, so far as providing for you, and in fact in all ways, fairly and justly. You must remember however that your unwifely, heartless and crewel treatment of me during my illness, has delayed my recovery many weeks and perhaps months, broken my heart spoiled the remaining years of my life and made it absolutely impossible for me to ever live with you again.' On July 15, 1914, he again wrote her, among other

things, 'I have loved you dearly and I still love you, and always shall I believe, but as I have said before we cannot live together again. I repeat this last not in a spirit of rubbing it in but for the sake of letting you know positively that I cannot change my mind in this respect, and the sooner we both realize this situation the better prepared we shall be to deal with it.' I find that the testator from his point of view had reached the conviction that his wife had turned against him and no longer loved him. Being thus convinced, he ceased to care for her or even to think of her except in terms of positive aversion and dislike. And on November 28, 1914, he brought in our courts a libel for divorce on the ground of cruelty, which was pending at his death. During his illness at Pasadena, both at his home and while in the hospital, his mind remained active, strong and clear, as shown by his continuous and very full correspondence relating to his affairs. In the deposition of Dr. Dudley Fulton, the attending physician, is found that statement, 'In his room I saw that he was worried . . . and I . . . asked Mr. Eaton if there was anything on his mind — if [he] was worrying about anything, if so, I did not want to know the details but just whether or not he had any mental worry, and he then told me about the financial wrong he had done his sons and the fact that he was not happy with the way Mrs. Eaton was treating him.' Dr. Fulton also says, 'that he was greatly worried over the injustice he had done his sons in regard to the prenuptial financial agreement with Mrs. Eaton . . .,' and 'brought up the subject of his wrong and extreme anxiety to set himself right with his sons in regard to financial arrangements' and 'expressed that he had not done his sons justice in his financial arrangements with Mrs. Eaton before their marriage.' In this connection it also should be stated that at the hospital and after correspondence by letter and telegram with counsel at Boston he called in local counsel and added a codicil to his will.

"I am unable on all the evidence to reach any other conclusion, except the conclusion that, from the time of the estrangement to the making of the will offered for probate, the testator's mind was centered upon the predominant purpose of so dealing with his property as to increase in so far as possible the share of his sons therein in rectification of what he considered to be a financial wrong done to them by the antenuptial agreement."

The single justice then reviewed the sixteen changes in the testator's will beginning with the day of his marriage to the defendant, the effect of which is described in the opinion, and continued:

"By the codicil of March 30, 1914, he directed the Pasadena property should become part of his general estate. By the codicil of May 16, 1914, while the Pasadena property was still to become part of his general estate, the widow was to receive $4,000 a year and the trustees were authorized to lease the property to her or to let it to other persons if in their judgment this was deemed advisable. The land, house, and furnishings had cost approximately $175,000, of which the testator had put in $154,000, made up very largely from the proceeds of securities which he converted, and, upon Mrs. Eaton's evidence, there seems no reason to doubt that she contributed $21,000 of her own money toward the furnishings.

"At this point I pause to say that I do not find it necessary to decide whether under the California Civil Code, § 158, and the California Code of Civil Procedure, which were introduced in evidence, the antenuptial agreement has been modified as alleged in the answer. It is a Massachusetts contract and can be modified only as provided by our laws, namely, in writing, of which there is no evidence. Nor is it requisite to go into the litigation, pending in California when the testator died, to determine whether the property is community or separate property or whether Mrs. Eaton has a right of homestead therein, or to review the correspondence between testator's counsel in California and his counsel here concerning the legal step necessary to be taken to try out these alleged rights. It is enough to say that the result was the formation of a corporation in California with a capital stock of $100,000, the par value of the shares being $100 each, to which the testator transferred the property, receiving therefor the entire issue of stock in payment. Of this stock $99,000 par value was transferred by him to his sons in return for their promissory notes without interest for $30,000 each. The testator also gave to them an agreement to indemnify them out of his estate for any loss suffered if Mrs. Eaton succeeded in establishing a right of homestead in the property or any other rights which would cut down or encumber the fee. The actual cash outlay by the three sons appears to have been a share apiece, the testator putting in $100 for the share issued to Charles. When all this had been accomplished,

the Pasadena property, being worth, as shown in evidence, at least $150,000, with an annual rental value of from $10,000 to $12,000, had been disposed of for $90,000 and in such a way that the sons owning nine hundred and ninety shares of stock, controlled the corporation, which is not shown to be indebted, and the entire title to the property subject to whatever rights, if any, Mrs. Eaton may have under the laws of California. It is plain, of course, that the sons can never be called upon to pay any interest on the notes; nor, on the evidence, could either son at the time the notes were given have paid any substantial portion of the principal from any money of his own. In passing upon the testator's dealings with the Pasadena property I have not deemed it material to set forth in detail the many phases of the transaction or transactions, although I have considered them all, including the formation of the corporation, the object and purposes thereby sought, the transfer to the corporation by the testator, the issuance of the stock to him, the transfer by him of the stock to his sons, the taking of their unsecured promissory notes for less than the par value of the stock, the indirect acquisition by them as the beneficial owners of property for $90,000 worth at least $150,000, and the giving of the agreement of indemnity, all of which steps were deliberately and advisedly taken by the testator with full knowledge of not only the terms but the legal effect of the antenuptial agreement upon his testamentary rights.

"I pass to the gifts or transfers to his sons of cash, stocks and bonds. During a period beginning in October, 1914, and ending in August, 1917, I find that Ezra S. Eaton received in money, stocks and bonds, $57,641.08; Malcolm H. Eaton, exclusive of mortgage on Malcolm's house for $25,000 given to Charles, $57,641.76; Charles F. Eaton, $55,593.86, making a total of $170,577.42. It appeared in evidence that the testator said that these gifts were made for the purpose of giving to each son an amount equal at least to the payments made to Mrs. Eaton after the separation, whether voluntary or under order of court or stipulation of counsel after the divorce proceedings were begun, and the expenses of the litigation paid to Mrs. Eaton's counsel. I find that for a period beginning in May, 1914, and ending on September 29, 1917, the testator advanced to Mrs. Eaton in one way or another but within the classification above

stated the sum of $73,700. The testator's income from the spa from May 1, 1914, to October 13, 1917, may be said to have been substantially $347,750.99. If the payments to Mrs. Eaton and the gifts are deducted, he had $177,723.57 for his personal and other expenses. The plaintiffs contend that all the gifts were from income exclusively derived from the spa, that is, current income and not income which had been capitalized, so to speak, by investments in stocks and bonds. But it is to be observed that the distribution was not only of cash but of a very appreciable amount in stocks and bonds. When he converted the income into stocks and bonds it would seem as if technically the income had been capitalized and the gifts of such stocks and bonds thereafter were gifts which diminished the principal; but, however this may be, there is evidence which I cannot wholly disregard, that the proceeds of the 'American Sugar Stock' and 'West End Stock,' sold by the testator and which had not been bought from current income during the period named, were used to buy the bonds distributed to the sons.

"Coming to the formation of the partnership consisting of the testator, Ezra and Malcolm, I have no doubt that the testator very earnestly desired that his sons eventually should succeed to the business which had been established and made successful through his efforts of some thirty-three years, aided, however, very largely by the long and loyal service of four able employees who had his entire confidence and upon whom he greatly relied. They are constantly referred to in the evidence as the 'big four.' It is not too much to say that during his absence in California winters, as well as when he was abroad, they practically ran the business. The sons Ezra and Malcolm, after completing their collegiate education, had been engaged before the formation of the partnership on wages or salary at the spa, which seems to me under all the circumstances not to have been unreasonable. The partnership was formed on November 13, 1915. At that time the personal property of the testator in the business had a value at least of $550,000, exclusive of the good will. The business for the year ending December 31, 1915, showed a net profit of $83,577.38. On December 31, 1916, the net profit was $120,677.35. The uncontradicted evidence is to the effect that the business as a whole, independently of the testator's ownership of a part of

the realty and his rights as lessee under leases of other parts, was worth from $800,000 to $1,000,000. By the contract of partnership the sons Ezra and Malcolm were each given and received by the terms of the conveyance a one seventh share for the term of ten years from the date of the agreement, or for such further time as the parties might determine, while the remaining five sevenths represented the interest of the testator. As to profits, the agreements provided, 'The partners shall be entitled to the net profits of the business in the shares above mentioned, i. e. five-sevenths (5/7) to Charles S. Eaton, one-seventh (1/7) to Ezra S. Eaton and one-seventh (1/7) to Malcolm H. Eaton. These profits shall be in lieu of salary or other compensation but the partners may draw from time to time on account of the profits such sums as may be mutually agreed upon. At the end of each year a general account shall be taken and the profits of each partner for the year determined and payment in full made thereof.' While I find that they were diligent and efficient in the performance of their duties, I am unable to find that their services were worth during the year 1915 $24,000, or during the year 1917 $66,000; or, in other words, in November, 1915, the date of the articles of copartnership, Ezra and Malcolm each were being paid $7,500 a year as salary, to which was added one seventh of the profits, amounting to about $12,000 apiece. In 1917 the year that their shares were increased from one seventh to one sixth, Ezra and Malcolm, including their respective salaries of $15,000, got $66,000. I find there was not past consideration for the agreement of partnership and the sons contributed no capital. The testator and Ezra and Malcolm as between themselves were co-principals or co-owners in a common business enterprise which of course included the profits. The testator accordingly during his lifetime would receive his share of the profits earned by the entire capital, while at his death only one half, after the sixth had been conveyed to Charles, remained as part of his estate under the terms of the will. But this is not the only consequence which must follow. The surviving partners have the exclusive right to possession of the firm's assets and to liquidate the firm's capital; and in a partnership accounting, Ezra and Malcolm are entitled to any and all sums by way of profits due to them, a part of which it is claimed they put back into the business."

The single justice then quoted article sixth of the will, described in the opinion, and continued: "These mandatory provisions and the formation of the copartnership are to be viewed as a whole when considering the scheme of the testator. It may well be asked where ordinarily in the open market could a purchaser be found for a business of this character who would buy a half interest therein with the sons owning and controlling the other half. It is true that the scheme legally does leave at least a half interest as the property of the testator; but practically the sons by reason of the partnership arrangements and their rights in liquidation as copartners and the rights given them under the will dominate the situation and can acquire the remaining half substantially on their own terms.

"The plaintiffs, [executors, two of whom are two of·the three sons of the testator, and the third son,] appreciating this aspect of affairs have filed the following stipulation: 'The undersigned, who are the executors named in the last will of said Charles S. Eaton and his heirs at law, admit the jurisdiction of this court in the exercise of its discretion to direct by final decree or by order entered in this suit the manner in which the interest of said Charles S. Eaton as a partner with his sons in the business known as "Thompson's Spa" shall be converted into cash, and in the exercise of such discretion and in that behalf to direct that the business and assets of the partnership be sold as a going concern to the highest bidder to be paid in cash, without prejudice, however, to the rights, if any, of the surviving partners to compete in like business with the purchasers at any such sale as fully and to the same extent as if this stipulation had not been filed.'

"Apart from the very serious question as to the authority of the present plaintiffs to bind the estate by any such stipulation, the defendant, who has declined to accept it, has the absolute right to demand specific performance, not only of the executors but of the heirs at law in accordance with the antenuptial agreement, a right which a court of equity ought not to cut down, but preserve. It would seem to be manifest that, if all the gifts and transfers to his sons as previously described had been contained in the will couched in the same or substantially the same terms, the testator could not be found to have specifically performed

his part of the antenuptial agreement. He covenanted to give
to the defendant by his will as much as he gave to any of his sons.
To say that the testator fulfilled his agreement to give to her an
equal share, and then to say that he performed his agreement by
indirectly or directly conveying a substantial part of his property
to his sons, is a mode of performance which cannot be sanctioned.
. . . The fact that notice of the formation of the proposed
partnership was given to counsel for the defendant, who at once
denied the testator's right to make such transfers of his property,
did not do away with his prenuptial obligations.

"I find that the contract or contracts of partnership were
entered into for the ulterior purpose of rendering nugatory as
far as possible the stipulations of the antenuptial agreement as to
equality of participation and distribution of the residue, as well
as to enrich the sons at the expense of his wife. Nor were these
agreements any the less fraudulent and testamentary in character,
although not testamentary in form, because consummated openly
with the purpose of evading the antenuptial contract. Whatever
disagreements from whatever cause existed between Mr. Eaton
and his wife, and whether he was justified or not in his opinion
of her conduct during the period heretofore referred to, he had no
more right to diminish her lawful claims than he had to defeat
the whole object of the settlement. As I have previously said,
the taking of the sons Ezra and Malcolm into partnership was not
a gift out and out of one seventh subsequently enlarged to one
sixth, to each of them freed from any possible control by himself.
He was to share, and shared during the remainder of his life, in
his proportion of the net profits from the whole business. It is
only upon his death and a winding up or settlement of the part-
nership affairs that his interest as distinguished and separate from
theirs and the rights of Charles can be ascertained and sold under
article six of the will, the sons or any of them at such sale to be
given the preference if they so desire over 'any other prospective
purchasers.'

"While I said to counsel during the trial and without making
any final ruling, that the question of intent or motive might not
be of controlling importance if what the testator did produced
the effect described, I am satisfied upon examination of the cases,
that it may be a material element in a case like the one at bar,

where an antenuptial agreement exists, even if, as some of the cases hold, a husband not under such an obligation may give away all his personal property for the express purpose of depriving his wife, if she survives him, of any participation therein.

"By the manipulation of his property in the manner above described, the sons share alone in the Pasadena property and in the stocks and bonds, while fifty per cent of the business of the spa as a going, prosperous concern, the source and continuous supply of the testator's wealth of every kind is also shared solely between them, leaving the widow to participate in only one quarter of what is left. If the will had been admitted to probate and the present plaintiffs appointed executors and a bill had then been brought to compel the defendant to accept the performance tendered by the will, a court of equity would not under the conditions above described decree specific performance. . . . Applying the same rule to the case at bar a decree is to be entered dismissing the bill with costs."

The plaintiffs made nineteen requests for findings of fact and three requests for rulings of law. The requests for rulings of law, which were refused, were as follows:

"16. By the antenuptial agreement Mr. Eaton covenanted to give to his wife by will the stipulated interest in the estate belonging to him at the time of his decease; he did not covenant either in terms or by implication not to make the gifts to them or form the partnership arrangements with them which are questioned in this case, and neither said gifts nor said partnership arrangements or contracts violate any of the terms of the antenuptial agreement.

"17. Article 6 of the will does not oblige or purport to oblige the sons or any of them to purchase the testator's share in partnership, or in case they desire to become purchasers, does not oblige or purport to oblige them to accept the preference therein authorized or to pay the purchase price in notes. It is wholly within the rights of the sons by filing the stipulation waiving such preference and such payment, to make it the plain duty of the surviving partners and of the executors of the will to see that the partnership assets and the testator's share in the partnership are reduced to cash in the most advantageous manner, and their action in so doing renders it needless to consider the defendant's claim that

the giving of such preference and the payment of the purchase price in notes would or might violate her rights under the agreement."

"19. Upon the facts found by the court the plaintiffs are entitled as a matter of law to the relief sought."

The plaintiffs alleged exceptions.

*S. L. Whipple & W. R. Sears*, (*B. B. Jones* with them,) for the plaintiffs.

*C. F. Choate, Jr.*, (*J. D. Colt* with him,) for the defendant.

Rugg, C. J.   This suit in equity is brought by the persons named as executors in an instrument purporting to be the last will of Charles S. Eaton, late of Marblehead, who died in October, 1917, to enjoin the defendant, his widow, from contesting the allowance of the instrument as such last will and from petitioning for a widow's allowance, and to compel her to perform specifically the terms of a certain antenuptial agreement executed between her and the deceased a day or two before their marriage in 1909.

The defendant filed a demurrer, for want of equity amongst other causes, and appealed from an interlocutory decree overruling it.   The same matter was set up in answer.   The defendant in open court has waived her demurrer.   Under these circumstances it is necessary only to consider whether the court has jurisdiction of the subject matter.   Consent or waiver by the parties cannot confer jurisdiction over a cause which is not vested in the court by law.   It is the duty of the court to consider that point of its own motion.   *Peabody* v. *School Committee of Boston*, 115 Mass. 383.   *National Fertilizer Co.* v. *Fall River Five Cents Savings Bank*, 196 Mass. 458, 462.   *Fourth National Bank of Boston* v. *Mead*, 214 Mass. 549.   *Boston Bar Association* v. *Casey*, 227 Mass. 46, 50.

The bill sets out an antenuptial agreement, executed in due form, according to the terms of which the defendant agreed to accept certain testamentary provisions to be made in her behalf by the deceased in place of all other claims upon his estate, and alleges that the deceased complied with all the stipulations of that agreement on his part to be performed, and made and executed a will wherein all the obligations to the defendant under the antenuptial contract have been met; that the deceased by

nominating the plaintiffs executors under the will imposed upon them the duty of presenting the will for allowance, and that in the attempt to perform that duty they find themselves obstructed wrongfully by the defendant in defiance of her covenant with the deceased. The prayer of the bill in substance and effect is that the obstacle in the way of their performance of duty caused by this unlawful conduct of the defendant may be removed. This presents a case under the circumstances within the jurisdiction of a court in equity. It is a necessary implication of every valid contract with covenants binding each party, that neither will interfere to prevent performance by the other. *Hebert* v. *Dewey,* 191 Mass. 403, 410. *Bailey* v. *Marden,* 193 Mass. 277, 279. *Tighe* v. *Maryland Casualty Co.* 218 Mass. 463, 468. It is an implied term of the antenuptial agreement here in issue that the defendant will not contest any will made by the deceased provided he carried out that agreement in all its parts. Such an agreement, after it has been fulfilled by the one agreeing or reserving to himself the right to execute a will, entitles his representatives to specific performance in equity. *Sullings* v. *Richmond,* 5 Allen, 187. *Tarbell* v. *Tarbell,* 10 Allen, 278. *Jenkins* v. *Holt,* 109 Mass. 261. *Paine* v. *Hollister,* 139 Mass. 144. Contracts made after the death of a testator, as to the disposition of property received under the will, between legatees, heirs at law and others having a pecuniary interest therein, are recognized as valid and are enforced in equity. *Ellis* v. *Hunt,* 228 Mass. 39, and cases there collected. The heir at law of a deceased person, who has entered into an antenuptial contract as to the share to be received by his wife from his estate, may enforce specific performance of the contract. *Collins* v. *Collins,* 212 Mass. 131.

The case at bar falls within the principle of these decisions. The plaintiffs, although not yet appointed by the Probate Court as executors, have the specific duty to present and seek to have allowed the instrument purporting to be the last will of the deceased. They have sufficient interest to invoke the aid of equity against one who under these circumstances hinders them in the discharge of that duty contrary to the terms of her contract with the deceased.

The case was heard on its merits by a single justice of this court, who made findings of fact incorporated in the record and

ordered the bill to be dismissed. The case comes here on excep-
tions by the plaintiffs. The pertinent facts as thus found are
that the deceased, a widower of about fifty-three years having three
sons, became engaged to be married to the defendant, then a
widow of about thirty-eight years, in 1909. The deceased had
established and was the sole proprietor of a restaurant in Boston
known as "Thompson's Spa." He was a man of unusual business
ability and of more than average literary accomplishments, as
well as of great foresight and determination in pushing through
to a conclusion whatever he resolved upon. His business income
from the time of his engagement until his death averaged not
less than $100,000 per year. His other property was at least
$180,000. In contemplation of his approaching marriage, the
deceased conceived the idea of an antenuptial agreement, which
he proposed to the defendant. It is conceded that this agree-
ment was fairly made. After appropriate recitals, its essential
terms enabled and bound him, provided the defendant became
and continued his lawful wife and survived him, (1) to make such
disposition of personal effects as he chose, (2) to give to such
persons or purposes as he might name legacies not exceeding ten
per cent in value of his real and personal estate as ascertained by
the probate inventory, (3) to divide the residue into equal parts,
one more in number than there were surviving children and
issue of any deceased child taking by right of representation, one
part to the defendant, one part to each surviving child, and one
part to the issue of each deceased child by right of representation,
the share of the defendant to be held by trustees on a spendthrift
trust, the net income thereof to be paid to her during life, (4)
to accept and receive from the estate of the defendant in case he
survived her only that which might be willed to him. The
defendant covenanted that, in case the deceased performed the
stipulations resting on him under the agreement, she would accept
the same in full of dower and other rights which otherwise she
might claim from his estate. Three sons survived the deceased.
He left no child nor children of a deceased child. Article 4 of
the instrument offered for probate as the will of the deceased,
after a recital in part of the provisions of the antenuptial agree-
ment, and an assertion that it is made in pursuance of the terms
of that agreement, establishes a spendthrift trust of one fourth

share of the remainder of his estate for the benefit of the defendant during her life, with a gift over. The sale of his interest in the spa as soon as may be done without unreasonable loss is directed by Article 6. It there is provided that his sons or any of them shall be given a preference over other prospective purchasers to the extent of permitting them to purchase at the same price offered by any *bona fide* purchaser, payment to be made wholly or in part by their unsecured notes bearing interest not exceeding four per cent pending the settlement of his estate.

The plaintiffs' contend that this will, with all its antecedent and concurrent facts, constitutes a performance of the antenuptial agreement. The defendant contends that the deceased intentionally violated that agreement during his life by giving to his sons for the purpose of defeating its covenants, a very large and substantial part of his estate.

It is not necessary to narrate the biographical details of the married lives of the deceased and the defendant. It is enough to say that, having been married in 1909, an estrangement came in 1914, followed by a separation, the deceased leaving the defendant at a house built at Pasadena, California, by him after the marriage at an expense including furnishings of approximately $175,000, to which the defendant had contributed $20,000, being substantially all of her estate. After a few months he returned to his home in this Commonwealth and later filed a libel for divorce, which was pending unheard at the time of his death. During the period of his married life with the defendant before the estrangement, the deceased made to her valuable gifts and was most generous in expenditure for her dress and travel, but not in amounts beyond or inconsistent with his ample income. From the time of the estrangement until the execution of the instrument offered for probate, the mind of the deceased "was centered upon the predominant purpose of so dealing with his property as to increase in so far as possible the share of his sons therein in rectification of what he considered the financial wrong done to them by the antenuptial agreement." In execution of that predominant purpose, with the full knowledge of the antenuptial agreement and its relation to his testamentary rights, he deliberately did three main things: (1) He caused to be organized a corporation for the ownership of the Pasadena property,

the ultimate result thereby accomplished, without setting forth
its various steps, being the indirect acquisition by his three sons,
through holding of capital stock of an unindebted corporation, of
property worth at least $150,000 with an annual rental value of
from $10,000 to $12,000 for $90,000, the share of each son in
even that payment having been made by his non-interest bearing
note. (2) He sold stocks owned by him at the date of the ante-
nuptial agreement and out of the proceeds, probably combined
with other investments of current income from the spa, between
October, 1914, and August, 1917, gave to his three sons sums
aggregating $170,577.42. (3) In November, 1915, he formed a
partnership of the business of the spa with his two older sons.
This business then was worth at least $550,000 exclusive of the
good will, and on uncontradicted evidence was worth as a whole
independently of leasehold or other rights in realty from $800,000
to $1,000,000. The share of each of the sons was one seventh
both in assets and profits and of the deceased, five sevenths. In
August, 1917, the share of each son was increased to one sixth and
that of the deceased diminished to four sixths. At the same time
the deceased and these two sons agreed with the third and youngest
son that he should become a partner and be given a one sixth
interest by the deceased in 1922, provided this son should earn
his right to it by faithful and diligent service in connection with
the business at a salary commensurate with his work. Pursuant
to this arrangement the two older sons in 1917, including salaries
fixed at $15,000, each received $66,000 from the business of the
spa. There was no past consideration for the copartnership and
the sons contributed to it no capital. The interest of each was
a pure gift from the deceased. The two elder sons as surviving
partners of the spa would have the exclusive right to possession
of the firm's assets and to liquidation of its capital. In this con-
nection the provisions of Article 6 of the will confer upon them a
dominating position respecting that business. The finding of
the single justice touching this matter is that the contracts of
partnership were entered into for the ulterior purpose of rendering
nugatory as far as possible the stipulations of the antenuptial
agreement as to equality of participation and distribution of the
residue as well as to enrich the sons at the expense of his wife,
and that these agreements and transfers were "fraudulent and

testamentary in character, although not testamentary in form"
and were made for the purpose of evading the antenuptial con-
tract. It is further found that "the taking of the sons Ezra and
Malcolm into partnership was not a gift out and out of one seventh
subsequently enlarged to one sixth, to each of them freed from any
possible control by himself. He was to share, and shared during
the remainder of his life in his proportion of the net profits from
the whole business. It is only upon his death and a winding up
or settlement of the partnership affairs that his interest as dis-
tinguished and separate from theirs and the rights of Charles
[the youngest son] can be ascertained and sold under Article 6
of the will, the sons or any of them at such sale to be given the
preference if they so desire over 'any other prospective pur-
chasers.'" Several changes in will and codicil were made during
the period of estrangement, the practical effect of which was not
to increase and probably was to diminish the defendant's testa-
mentary share in the estate of the deceased.

The findings of fact must be accepted as final. It is plain that
they are supported by the evidence. That the conduct of the
deceased was deliberately designed is manifest not only from all
the circumstances, including his general intelligence and intel-
lectual acumen, but especially from his refusal to accept and
follow the advice of the one who had been his attorney for many
years and who drew the antenuptial contract, to the effect that
under its terms he could not give interests as partners in the spa
to his sons, and his resort to the counsel of others.

The refusals to make certain findings of fact requested by the
plaintiffs present no question of law. The single justice saw the
witnesses and observed their manner of testifying, and was in a
better position than any one else can be to pass upon their credibil-
ity. A bill of exceptions in equity presents only questions of
law. *Kennedy* v. *Welch*, 196 Mass. 592, 594. *Malden & Melrose
Gas Light Co.* v. *Chandler*, 209 Mass. 354, 357. It was the province
of the single justice to make a final determination touching the
facts put in issue by the pleadings. Requests for findings of
fact in such connection have slight, if any, relevancy at this
stage of the case. See *Warfield* v. *Adams*, 215 Mass. 506, 520.

The precise question presented is whether, when a man has
made an antenuptial contract with a woman, who in reliance

thereon becomes his wife, to give her by will a share of his estate equal to that to be given by will to others, the husband lawfully may by deliberate design for the express purpose of diminishing the money value of the testamentary provision for the wife, make lavish gifts from his estate to others during his life. That question never before has arisen for adjudication in this court.

It was held in *Redman* v. *Churchill*, 230 Mass. 415, reviewing and affirming earlier decisions, that a husband, who was under no contractual obligation to his wife, has "the right to dispose of his personal property during his lifetime without her consent, and she cannot impeach a gift made by him as a fraud upon her because made to prevent her from acquiring any portion of it." It was held in *Kelley* v. *Snow*, 185 Mass. 288, that a wife under no antenuptial covenants may make a present transfer of all her personal property to a trustee, retaining a beneficial interest to herself during life with gift over to a third person on her death, and reserving the right of variation by subsequent appointment, even though all this is done for the express purpose of preventing her husband from sharing in her estate. Those decisions do not reach to the point now to be determined, because no antenuptial contract was involved in either of them. The intent of a donor is of no consequence in such a case, because the rights of the relict in the property of the deceased spouse is purely the creature of statute. Each is entitled to that which the statute establishes and to nothing more, and the statute says nothing about intent. The fact alone is controlling.

The decisions are uniform, so far as we are aware, to the effect that where there is an antenuptial contract and the parties to the marriage have voluntarily elected not to depend upon the provisions of the law but upon the terms of an express agreement, a different rule applies. Such parties are not absolutely free to give away their property at their own volition. The reason for a different rule doubtless is that, where a man and woman who are to become husband and wife undertake to establish the rights of each in the property of the other by contract, they are held to reasonableness and good faith in its execution. The contract is of course to be interpreted according to its words. No contract is to be construed in conformity to the mere unexpressed expectation of the parties to it. Hope of the one or apprehension of the

other not written into the agreement constitutes no part of its obligation. There are, however, certain implications which arise out of the nature of the transaction where a man and woman in contemplation of marriage attempt to settle by contract their respective property rights in the estate of the one who shall die first. The participants in an antenuptial contract do not stand at arm's length with reference to each other. Their relation is one of highest trust and confidence. It demands the utmost good faith on the part of each. This is not only a necessary concomitant of the execution of such an instrument, but the performance of its stipulations must also be in the same spirit. Without analyzing further the grounds for a different rule governing the rights of parties to an antenuptial contract from that which governs the rights of a husband and wife unaffected by such contract, it is enough to say that the substantially universal consensus of common law courts to that effect is a sufficient basis for its existence, recognition and acceptance. What that rule is has been differently phrased by judges of eminence. One of the most frequently quoted statements is that of Lord Chancellor Brougham in *Logan* v. *Weinholt*, 7 Bligh, (N. S.) 1, upon which the plaintiffs strongly rely. That was a case where, amongst other matters, an uncle, after reciting the intended marriage of his niece, covenanted upon her marriage to give by will to her or to the issue of her marriage as much as he gave by will to anybody else. The marriage took place. Thereafter the uncle bought estates with life use to himself and remainder to persons other than the niece and her issue. It was with reference to those facts that it was said at page 53: "Now, upon due consideration of the authorities and principles of law, I take the rule touching these matters to be this: If a person covenants or agrees, or in any manner validly binds himself to give to A. by his will as much as to any other, he may put it out of his power to do so by giving all in his lifetime; or if he binds himself to give A. as much as B. by his will, he may in his lifetime give B. what he pleases, so as his will shall give A. as much as his will gives B.; but then, the gifts which he makes in his lifetime to B. must be out and out; for, if to defraud or to defeat the obligation which he has entered into, he gives to B. any property real or personal over which he retains a control, or in which he reserves an interest to himself; then in order to

protect the agreement or obligation which he has entered into, and to defeat the fraud attempted upon that obligation, and to prevent his escaping, as it were, from his own contract, this gift to B. shall be taken as testamentary, — shall be taken as if included in the will, — and the subject matter of it shall be brought back and made the fund out of which to perform the obligation: at all events it shall be made the measure for calculating and ordering the performance of, or dealing with the claim arising under that obligation." To the same general effect see *Fortescue* v. *Hennah,* 19 Ves. 67, and *Johnson* v. *Hubbell,* 2 Stockt. 332, 337.

It is manifest from the reasoning and decision of *Kelley* v. *Snow, ubi supra,* that such reservation of income for life and gift over of remainder at the death of the donor as was before the court in *Logan* v. *Weinholt,* is not "testamentary" in any true sense. There is nothing essentially testamentary in the act of a man making a present gift of his property to a trustee, reserving income for life to himself with remainder at his death to third persons. A man free from legal requirement to anybody respecting the disposition of his property may give it in that or a similar way and such remainder vests at once in the remainderman. An instrument of that sort need not be executed with the formality required for a will. Apart from any agreement and having regard to the statute of wills, the arrangement before the court in *Logan* v. *Weinholt* contravened no principle of law. *Kelley* v. *Snow, ubi supra.* But a court of equity laid hold of those facts and invalidated that arrangement in *Logan* v. *Weinholt* simply because it was unreasonable, or fraudulent, or lacking in good faith, or in violation of the implications of the agreement, and treated the disposition as "testamentary" in nature. The underlying justification for such interference by equity is that the act was designed to and would accomplish, if permitted to stand, the defeat of the obligation of the covenants and frustrate the fair performance of the contract. It also is to be noted that in that case the attempted gifts were held contrary to the contract. It was not necessary to state with fulness and precision the converse of the rule whereby gifts would be held valid.

The rule was put with more comprehensiveness and accuracy by Lord Hatherly, while Vice Chancellor Wood, in a case involving a

covenant in a marriage settlement for the benefit of his son by a father, in these words: "It is true, that, notwithstanding the covenant, the father might have disposed of the whole of his property in his lifetime, provided such disposition were not made in fraud of or for the purpose of defeating his covenant, as it was in *Jones* v. *Martin* [3 Anst. 882, more fully reported in 5 Ves. 266, n.]." *Eyre* v. *Monro*, 3 Kay & Johns. 305, 309. These words are quoted with approval and followed in *Keays* v. *Gilmore*, Ir. R. 8 Eq. 290, 294, 295. The rule as stated by Lord Hatherly was foreshadowed in *Gregor* v. *Kemp*, 3 Swanst. 404. The facts there were that Joan Kemp covenanted to will one fourth part of her estate for the benefit of A. Repenting of the terms of her agreement, she sought by present gifts to transfer £1,000 to others. The Lord Chancellor was of opinion that the disposition was in fraud of the covenant. He conceded that, notwithstanding the agreement, Mrs. Kemp was not restrained from disposing of any of her estate in any way in her lifetime and had full power over it but "with this single exception (viz.) she was restrained from making a distribution on purpose to defeat the covenant." The rule of Lord Hatherly was adumbrated by the still earlier decision of *Webster* v. *Milford*, 2 Eq. Cas. Abr. 362, 363, where the Lord Chancellor is reported to have said in substance though with brevity, that under marriage articles it is not in the power of the husband purposely to defeat the articles by alienation or gift of his property. See in this connection *Randall* v. *Willis*, 5 Ves. 262, and *Jones* v. *Martin*, 3 Anst. 882, reported much more fully in 5 Ves. 266, note.

In *Dickinson* v. *Seaman*, 193 N. Y. 18, 24, the query was put whether under a marriage agreement the deceased husband "could give away all his property to his own relatives, and thus defeat the antenuptial contract altogether." And it was said "assuming that he could not do this because it would be unreasonable, it is further asked where the line is to be drawn between the power to give away all and to give away nothing. That line is to be drawn where the courts always draw it when they can, along the boundary of good faith. If the decedent had given away property with furtive intent, for the purpose of defeating the antenuptial contract and of defrauding the plaintiff, the gift would have been void." In *Vanduyne* v. *Vreeland*, 1 Beas.

142, an agreement by an uncle that he would take into his family an infant nephew and give him property at the death of the uncle and his wife, was the subject of inquiry. It there was said: "The defendant, Vreeland, had a perfect right to dispose of the property as he pleased, provided he did not make a disposition of it to take effect after his death, which would have been a fraud in law, or constructive fraud upon the agreement, whether he intended it as a fraud or not, or a disposition of it, for the sole purpose of defrauding the complainant, and depriving him of the benefit of his agreement, which would have been an actual and positive fraud." In *Austin* v. *Davis*, 128 Ind. 472, it was recognized that under agreement for adoption of and testamentary gift to a child there was a limitation upon the right to make gifts to other persons during life; that they must not be made for the purpose of defrauding the child, and must be "made in good faith."

Several of the decisions to which reference has been made involved agreements touching the disposition of property by will for persons who were not either the husband or the wife of the testator. There is at least as strong ground for holding that such agreements between persons in contemplation of marriage impose restrictions upon the right to give away property to others as there is for reaching such a conclusion as to like agreements made between persons not in contemplation of marriage.

Apart from the authority of decided cases and on reason there appears to us to be no sound distinction between an out and out gift by the covenantor under an antenuptial agreement for the purpose of defeating the agreement and a present gift to a third person for the same purpose of the principal of a fund or estate with reservation of income or use to the giver for life, there being no clause in the agreement expressly covering the point. The one manner of giving is no more testamentary in its essence than the other, using the word "testamentary" with accuracy of meaning. If regard be had to the effect upon the wife, it is the same in either event. If regard be had to the effect upon the donor, he suffers no more by making such a gift of remainder than if he carried out his agreement. The effect upon him, however, is an immaterial factor. The antenuptial agreement, so far as concerns the wife, is not made for the benefit of the husband. His testa-

mentary power is affected, sometimes by restriction, sometimes, as in the case at bar, by enlargement. The purpose of the covenantor in case of either manner of giving is to prevent the operation of the agreement upon his property to the end that he may accomplish a detriment to his wife. The cases, which hold that a settlement with reservation of life estate to the donor and remainder over is bad, rest upon the proposition that it is a fraud upon the marriage agreement perpetrated to defeat its obligation. It well may be that such settlement is proof positive of a purpose fraudulent as against the marriage agreement. It is, however, equally a fraud upon that obligation and equally designed to defeat the covenant to make a present gift for that purpose. Harm to the covenantee follows equally in each case, whatever may be the form of the gift.

The circumstances under which an antenuptial contract is made import a purpose that it shall confer real rights and impose substantial obligations. It is an implied term of such an agreement that it shall be fairly carried out and that it shall not be performed in hate, trickery, perversity, or distrust. The inference rationally to be drawn from the conditions attendant upon an antenuptial agreement is that it is designed to give something of value to the wife and that it is not an empty form. It is more consonant with the situation to infer that, if the parties intend that power shall be reserved to the husband wholly or in large measure to deprive the wife of property rights by making gifts for that purpose during life and thus leave nothing or much less than might rationally have been expected for the will to operate on, it should be expressed in the instrument, than it is to deduce the reservation of such power contrary to the whole spirit of the instrument and the nature of the transaction. The right secured to the wife by implication is that she shall be treated fairly and rationally in the matter of distribution of his property by the husband by gifts during his life.

The true rule, fairly to be deduced from the weight of authority and resting on sound reason, is that a man, who has entered into an antenuptial agreement with a woman, who becomes his wife, to give her by will a proportional part of his estate, may without breaking his agreement make gifts during his life in good faith and reasonable in amount having regard to all the circumstances,

but he cannot make gifts either absolutely, conditionally, indirectly or otherwise for the main purpose of defeating his agreement and preventing it from operating for the benefit of his wife. The motive in such a case affects the validity of the transaction because it determines "the extent of a privilege to infringe upon the admitted right of another." *Leonard* v. *Leonard,* 181 Mass. 458, 461. The adoption of any other rule in substance would put it in the power of a husband to strip himself during life of all his property, make his antenuptial agreement a barren instrument and leave his wife penniless. A result like that would be contrary to every inference arising from the relation of the parties and the purpose of an agreement.

The conclusion here reached is somewhat analogous to many classes of cases where equity in the interest of good faith and fair dealing enjoins contrary conduct either by mandate or restraint. For example, prohibition of use of information, acquired through employment, to harm of employer, *Essex Trust Co.* v. *Enwright,* 214 Mass. 507, *Aronson* v. *Orlov,* 228 Mass. 1, 5; protection of vendee of good will against setting up of a rival business by vendor, *Old Corner Book Store* v. *Upham,* 194 Mass. 101, *Foss* v. *Roby,* 195 Mass. 292, and appropriation of appointed property to payment of debts of appointor, *Shattuck* v. *Burrage,* 229 Mass. 448, all are equitable doctrines, engrafted on written instruments silent upon the subject, because consonant with fundamental ethical rules of right and wrong.

The findings of fact bring the case at bar fairly within this principle. A court of equity will refuse any relief by injunction upon such facts.

The stipulation signed by the three sons and the persons named in the will as executors, purporting to relinquish some of the preferential rights of the sons in the partnership and agreeing that the interest of the deceased therein may be sold under order of court, has no bearing upon the question whether the antenuptial agreement has been performed by the deceased.

It follows from what has been said that all the plaintiffs' requests for rulings were denied rightly. No error is disclosed on this record.

                        *Exceptions overruled.*