CENTER GARMENT CO., INC. vs. UNITED REFRIGERATOR
COMPANY.

Bristol.    December 4, 1975. — January 30, 1976.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, & WILKINS, JJ.

Contract, Performance and breach, Franchise.    Damages, Breach of
contract.

Where a contract provided that a franchise holder would buy certain
materials necessary for the operation of a sign manufacturing
machine from its franchisor or, alternatively, would submit mate-
rials purchased from another supplier to the franchisor for ap-
proval as to quality, and the franchisor thereafter informed the
franchise holder that it could no longer supply the material and
that the holder would have to find its own supplier, the franchise
holder was entitled to terminate the contract and recover for
total breach. [634-638]

Where there was insufficient evidence of the profits the plaintiff
would have earned during the unexpired term of a contract
breached by the defendant, there was no error in measuring the
plaintiff's damages by the value of a machine and various materi-
als bought by it in reliance on the contract. [638-640]

CONTRACT. Writ in the Superior Court dated Febru-
ary 13, 1973.

The action was referred to an auditor, findings not
final, and subsequently heard by Taveira, J.

After review was sought in the Appeals Court, the
Supreme Judicial Court, on its own initiative, ordered
direct appellate review.

Ephraim F. Horvitz for the defendant.

Abner Kravitz for the plaintiff.

KAPLAN, J.    Center Garment Co., Inc., a franchise
holder, as plaintiff, brought this action against United
Refrigerator Co., its franchisor, as defendant, alleging
that the defendant committed a breach of the franchise

agreement by failing to furnish certain supplies when ordered. The defendant answered with a general denial.[1] The action was tried to an auditor ("facts not final"), and then, as to certain issues, was heard by a judge of the Superior Court sitting without a jury. The judge, on the basis of the auditor's findings of fact, which he accepted, and other evidence before him, made findings, rulings, and order for judgment, and finally entered judgment for the plaintiff for $4,600.[2] The defendant appeals.

1. *Contract terms.* The gist of the written contract of August 26, 1969, between plaintiff and defendant, as far as now relevant, was as follows. The plaintiff was to buy from the defendant a machine for the manufacture of plastic display signs for a price of $4,995. This was its outlay for a nonexclusive license during the term of the agreement — five years with possible yearly renewals — "to operate a 'Signman' business" in five counties in Massachusetts, using the defendant's trade designation "Signman" and the good will and merchandising system associated with it. By § 5C of the contract the defendant "agrees . . . [t]o make available to Franchise Holder a central purchasing program for materials, forms and supplies used in the sign business." By § 6E the plaintiff "agrees" as follows: "In order to achieve uniformity and quality merchandising, Franchise Holder agrees to purchase plastic materials necessary for the operation of the sign manufacturing machine from [the defendant], or, in the alternative, agrees to submit to [the defendant] for approval as to quality, plastic of any other supplier. If material other than plastic furnished by [the defendant] is used the Franchise Holder agrees not to use the

---

[1] The defendant also pleaded excuse by reason of the plaintiff's breach, but this defense was untenable. The plaintiff's nonpayment of certain charges (used as a set-off, see n.2 below) did not furnish such an excuse.

[2] The defendant as plaintiff in set-off pleaded and established a set-off of $327 which need not be further considered.

name 'Signman' to identify such product. Franchise Holder's failure to procure [the defendant's] approval of the quality of plastic used shall constitute a breach of this Agreement, since quality of material and performance is essential to the good will and reputation of the Signman System, and this Franchise shall thereupon terminate upon 30 days notice."

2. *Performance under the contract.* Operations under the contract to the time of the events in suit ran thus. The plaintiff purchased the machine (including some material) from the defendant at the price stated. It advertised for salesmen to solicit orders for signs; eventually it had about 200 such salesmen, who were independent contractors working on commission. All of the plaintiff's signs were manufactured by means of the machine; most of its signs were fabricated of white acetate, a plastic. The plaintiff purchased the bulk of this plastic and other materials used from the defendant; only occasionally did it buy from others. Its business was only of modest size with annual gross sales running between $13,000 and $16,000.

On November 13, 1972, the plaintiff sent an order to the defendant for white acetate. Under date of November 28 the defendant informed the plaintiff that as "we can no longer obtain a good quality of white acetate from our supplier, we are not going to carry this in stock any longer. Therefore, we will no longer be able to fill your orders for SA4220 White Acetate." The plaintiff through its manager Richard P. Trieff protested in reply that "you don't even let me know names of other suppliers. That's bad business and must be a violation of our contract." There was evidence that Trieff called the defendant's franchise director Fred J. Applebaum on December 4 and was then told, in substance, that the plaintiff could check around locally and consult the "yellow pages" to find suppliers of acetate. On December 19 the plaintiff cancelled some sixteen outstanding orders for signs and went out of business. It promptly

commenced the present action. On December 28 the defendant wrote its franchise holders that it had secured a new supplier of acetate and would fill orders after January 15, 1973.

From the evidence before the auditor and the judge it appeared that about November 1, 1972, the defendant knew or should have known that its one supplier of acetate — it had not taken the precaution of locating a backup supplier — was unreliable as a source for the future. It did not make a serious effort to find another supplier until after November 27 when the failure of the regular supplier was confirmed.

There was, indeed, some general shortage of plastics including acetate at the time. Yet when the plaintiff tried by telephone to locate a supply of acetate in New England, it did find the material available in rolls (though not in sheets accommodated to its use). Presumptively the ability of the defendant, the larger buyer, to find sources, was greater than the plaintiff's (a reason for entering a franchise contract in the first place). When the defendant exerted itself it did find a substitute supplier, but the materials would not have reached the plaintiff until more than two months after it had submitted its order.

3. *Breach.* On findings generalized from the evidence, the judge held the defendant in breach of the contract. The defendant in its requests for rulings protested that there had been a misconstruction of the nature of the defendant's duty. It said that its agreement under § 5C to "make available . . . a central purchasing program" amounted to no more than an undertaking as an "agent" to use good faith and reasonable diligence to find a supplier for material which the franchise holder might order through the defendant; when the defendant had no relevant supplier, the franchise holder was free under § 6E to turn to an alternative source, the defendant, presumably, being bound not to withhold its assent to outside purchases unreasonably. The plaintiff, on the

other hand, stressed the franchise holder's agreement under § 6E "to purchase plastic materials . . . from [the defendant]," which implied a reciprocal obligation on the defendant's side to meet the franchise holder's requirements; it pointed to the fact that in practice it bought from the defendant, not through it; the alternative of § 6E was not, it said, an escape for the defendant but rather a franchise holder's option or privilege which in all events entailed the disadvantage that the product would be barred the benefits of association with "Signman."

The judge (and the auditor as well[3]) favored the plaintiff's construction of the contract as one for the sale of the plastic on a "requirements" basis. He proceeded to the question of the possible bearing of Uniform Commercial Code (G. L. c. 106) § 2-615, "Excuse by Failure of Presupposed Conditions," and then held, contrary to the defendant's requests for rulings, that the defendant was not excused. On the assumed construction of the contract, the judge was right. For the key question under § 2-615 is whether "performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made" (§ 2-615 [a]), and the failure of the defendant's supplier to perform was not such a contingency. See *Mishara Constr. Co.* v. *Transit-Mixed Concrete Corp.*, 365 Mass. 122 (1974); *Canadian Indus. Alcohol Co.* v. *Dunbar Molasses Co.*, 258 N.Y. 194 (1932); Restatement (Second) of Contracts § 281 (Tent. Draft No. 9, 1974). It seems to us, however, that even if the defendant's duty was simply to use good faith and reasonable diligence to furnish the plaintiff with a source, and even if the "alternative" of § 6E of the contract is read in a most indulgent way, the defendant stood in breach when, in effect, it dismissed the plaintiff

---

[3] The auditor after finding facts left to the judge the legal question whether the defendant could be excused under G. L. c. 106, § 2-615.

and told it to forage on its own for a supplier. This subverted the franchise relationship.

It was a closer question — but not made the subject of any distinct objection by the defendant — whether the defendant's breach entitled the plaintiff merely to recover for that breach while continuing to abide by the contract, or was so material in all the circumstances as to justify the plaintiff in throwing the contract over and suing for total breach. See Restatement of Contracts §§ 275-276 (1932); Restatement (Second) of Contracts § 268 (Tent. Draft No. 8, 1973). Implicit in the judge's decision is the view that on the facts the breach was such as to entitle the plaintiff to the more drastic response, and we should not disturb such an assessment by the trier.[4] The record suggests that the plaintiff may have seized the chance for terminating the contract with some enthusiasm, as it had been considering disposing of the business;[5] but if the facts justified the termination in law, we are not at liberty to analyze possible ulterior motives.

4. *Damages.* The auditor found that net profits lost through the cancellation of the sixteen orders amounted to $350. He added $3,900, the value, as he estimated it, of the machine and various materials as left on the plaintiff's hands. This is to be understood as a use of a "reliance" formula of recovery instead of the more familiar "expectancy" formula where — as the auditor indicated — there was not enough evidence on which to apply the latter measure. The value of the machine at the time of breach may be taken here, very roughly, to correspond to so much of the initial investment the plaintiff was willing

---

[4] The judge remarked on possible mitigation of damages by the plaintiff after January 15 but in awarding damages he evidently went on a theory of total breach.

[5] A sale of the business would require the cooperation of the defendant because of a provision of the franchise contract forbidding assignment by the franchise holder. It is indicated on the record that the defendant was inclined to cooperate.

to make in reliance on the contract as was lost through the defeat of that reliance: it was, very roughly, the unamortized part of the investment. Other materials bought against the contract were also taken into account. The sum of $3,900 was awarded in lieu of an estimate of the net profits the plaintiff would have earned during the unexpired term of the contract.[6] We dealt with the "reliance" measure, although in a different context, in *Sullivan* v. *O'Connor*, 363 Mass. 579 (1973), and need not repeat the groundwork here. See *L. Albert & Son* v. *Armstrong Rubber Co.*, 178 F.2d 182, 189-191 (2d Cir. 1949); *Sperry & Hutchinson Co.* v. *O'Neill-Adams Co.*, 185 F. 231, 239-240 (2d Cir. 1911); *C.C. Hauff Hardware, Inc.* v. *Long Mfg. Co.*, 260 Iowa 30 (1967); Fuller & Perdue, The Reliance Interest in Contract Damages, 46 Yale L.J. 52 (1936), 373-377 (1937) 5 A. Corbin, Contracts § 1031 (1964); Annot., 17 A.L.R.2d 1300 (1951).

The defendant does not intimate a preference for the "expectancy" calculation, which might have resulted in heavier damages,[7] and, indeed, did not object in the course of the action to the calculation that was made. In its brief the defendant seeks to quarrel with the judgment that it pay the value of the machine despite the fact that the plaintiff still retained it. The auditor, however, considered that with the closing of the business the machine and other material lacked any function and could not be sold, and the record as we have it does not gainsay this. In any event, the attempt was really to find a figure fairly if not precisely representing the plaintiff's loss in reliance, and we could not say there was material error even if the defendant had sought to point

---

[6] The auditor said he was finding the amount a willing buyer would pay for the machine and other things, if there were such a buyer, but he thought there was none.

[7] The auditor took the net profits for 1970, 1971, and 1972 to be, respectively, $4,735, $3,199, and $4,386.

it out by due objection. In one small particular, however, the judgment contains a miscalculation which should be corrected. The judge without basis allowed $700 instead of the $350 found by the auditor. To the extent of the difference, there would be an excessive or "double" recovery as the judge allowed as much as the auditor for the reliance. The judgment is modified by reducing its amount from $4,600 to $4,250, and, as modified, is affirmed.

*So ordered.*