**HAWES OFFICE SYSTEMS, INC., Plaintiff,**

**v.**

**WANG LABORATORIES, INC., Defendant.**

**No. 80 CV 1070 (ERN).**

United States District Court, E.D. New York.

Feb. 28, 1984.

Collard, Roe & Malcolm by Allison C. Collard, Roslyn, N.Y. and Joseph R. McPhee, Jr., Garden City, N.Y., for plaintiff.

Sullivan & Cromwell by James W. Dabney and Owen & Fennell by Robert D. Owen, New York City, for defendant.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This diversity action arises from a claimed breach of an agency agreement between plaintiff Hawes Office Systems, Inc. (Hawes), an office equipment dealer located in Nassau County, New York, and defendant Wang Laboratories, Inc. (Wang), a manufacturer of data processing equipment located in Massachusetts. Under a provision of the agreement, the law of Massachusetts governs.[1]

After a bench trial, the following constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a). By virtue of prior proceedings, *Hawes Office Systems, Inc. v. Wang Laboratories, Inc.,* 524 F.Supp. 610 (E.D.N.Y.1981) and 537 F.Supp. 939 (E.D.N.Y.1982), the following issues remain for decision:

1. Whether Wang breached the agency agreement by interfering with Hawes' business.

2. Whether Hawes is entitled to interest upon commissions paid by Wang pursuant to the Court's order of April 23, 1982.

3. Whether either party is entitled to an attorney's fee pursuant to paragraph 10 of the agency agreement.

The following facts are not in dispute. On January 25, 1979, Hawes and Wang

---

1. Plaintiff contends that the law of New York is comparable.

entered into an agency agreement, which terminated on January 25, 1981. 537 F.Supp. at 944. In exchange for commissions, Hawes agreed to merchandise a designated line of Wang word processing products in the four counties on Long Island and Staten Island. The first year's sales quota, renegotiable annually, was $300,000 net, and during the second year, $600,000 net.

## I.

Plaintiff's theory of recovery is relatively straightforward. It contends that in 1980, Wang decided that plaintiff held too lucrative an agreement. To remedy this situation, Wang salesmen Ladimir, Buckley, and Benson assisted their supervisor, Esposito, at Esposito's direction, to sabotage Hawes' agency.

Esposito joined Wang in August 1979 as branch manager. He shared office space with Hawes in Lake Success, Nassau County, from which he marketed the data processing product line and Hawes marketed the word processing product line. Eventually Hawes moved to its own offices in January 1980. About that time, the parties discussed a "joint venture" so as to maximize their business potential in the territory they covered.

The negotiations produced nothing but arose in part from Esposito's belief that Hawes was not maintaining Wang's best interests. For example, he cited Hawes' sale of word processing equipment to Farmingdale High School, which had purchased data processing equipment from a Wang competitor on the perception that Wang neither sold nor made data processing equipment. He also noted two cases in which customers had contracted for "conversion" work. Both customers thought that their commitments derived from Wang itself.

Esposito added that he had telephoned Hawes on several occasions when the phone was answered by Wang Labs. This confusion and possible abuse of Wang's name underlay part of a dispute between the parties which engendered a letter of termination on March 31, 1980. Hawes responded by filing suit in April; Wang withdrew the letter of termination on May 1, 1980.

In May 1980, Esposito again approached Hawes about a joint marketing strategy. In exchange for not soliciting large accounts (companies), those with annual sales above $25,000,000, Hawes would be able to sell data processing equipment to smaller accounts, those with annual sales under $25,000,000. These negotiations had followed "legal discussions" related to the aforementioned termination letter.

Esposito never testified specifically that any of his salesmen were informed of the withdrawal of the termination letter. They were simply told of the "situation", which officially consisted of continuing to accept and process Hawes' orders. Buckley and Ladimir knew of the termination letter and that they were to sell word processing equipment; however, their testimony, without more, hardly evidences a breach or intent to breach. The agency agreement did not contain territorial restrictions; Wang salesmen were entitled to compete with Hawes.

By way of additional circumstantial evidence, from which to draw adverse inferences, plaintiff asserts that more than competition occurred. Esposito admitted that he sent a letter, dated September 22, 1980, to 1,200 Wang customers informing them that Hawes was no longer an authorized dealer. Plaintiff further urges, based upon assertedly disinterested testimony of its customers' employees, that the plan to terminate him was well under way by the Summer of 1980.

Alfred Piscop of Doubleday & Co., Garden City, related his company's history with Wang word processing. In 1979 Doubleday upgraded its Wang system through Hawes which provided a "good quality" of training. In September 1980 Piscop decided to add another terminal:

"A Approximately four to five weeks after we submitted the purchase order we got a call from Wang Laboratories,

Inc., Dan Ladimir the sales representative, who told me that Hawes was no longer the authorized representative from Wang, and that the order should be resubmitted through Ladimir." T. at 688.

Ladimir, who called sometime in October 1980, gave no reason for the order's rejection other than that Hawes was no longer Wang's representative.

Ladimir testified that he did not know the reason for the rejection and had so stated to Piscop. He claimed that he had contacted Doubleday in the past and had contacted Piscop just before Piscop first complained to Wang about the delayed order.

During the interim, until December 1980, Hawes furnished Doubleday a terminal. Piscop added that the Wang supplied training was not as good as Hawes had provided in 1979.

In November 1980 Piscop recommended a one-year rental of a Wang word processor with three terminals and a twin sheet feeder. He advised Doubleday to rent from Hawes because Hawes would train three operators—Wang would train only one operator—and Hawes' training course was superior.[2]

Cross-examination proved unfruitful. Wang's efforts to elicit facts that Hawes was misrepresenting himself failed. Piscop stated that, based upon the "normal state of affairs in the industry", he had the impression that the agency was exclusive. Hawes had not suggested purchasing any data processing equipment such as small computers; however, the agency agreement did not require Hawes to make referrals or to "push" Wang's other product lines.

Frank Agovino, senior patent attorney for Hazeltine Corp., Suffolk County, also attested to Hawes' superior support services. Hawes had furnished a substitute printer when the one purchased had malfunctioned; without the printer, the system was worthless to this customer. In November 1980 Agovino had complained to Benson about the system's failure to "line number"—automatically number the lines of a document in the left-hand margin as the document is produced—a feature very convenient to patent lawyers. Benson told him that Hawes was no longer an authorized dealer. Wang eventually furnished the feature as part of a math package, but never explained how to use the feature, which had been a strong selling point of the system.

Donald Brancaccio, assistant vice president of the Equitable Life Insurance Society, purchased Wang equipment after several demonstrations by William Bauer, plaintiff's salesman. The demonstrations had occurred both in plaintiff's territory and outside plaintiff's territory at Equitable's offices in Manhattan. At a meeting held in Manhattan and attended by Tom Schwantner, a Wang executive, Brancaccio learned, for the first time, that Equitable had a corporate contract with Wang and that "the purchase could not be put through the local vendor." He first heard of Hawes upon receipt of the subpoena to testify, a point Wang's counsel emphasized on cross-examination:

"Q I take it that you understood when we were dealing—when you were dealing with Mr. Bauer that he was a Wang employee at the time?

"A Yes." T. at 726–27.

The essence of the Piscop/Doubleday case was repeated with E.D.S. Nuclear of Melville, Long Island, a nuclear engineering consulting firm. Elizabeth Stevens, word processing manager, testified that E.D.S. purchased Wang equipment from Hawes in May 1980. It was delivered in July 1980. Subsequently, E.D.S. placed four orders for Wang equipment in October 1980 and in response received a letter signed by Benson and Esposito in November 1980, stating that Hawes was no longer

---

**2.** From Piscop's cross-examination, T. at 697, the Court infers that this order was never placed.

an authorized representative. Stevens also complained to Wang headquarters in Lowell, Massachusetts:

"Q And what did customer complaints say about the orders?

"A Nobody was really giving me a straight answer as to where these orders were. I never got in contact with—I never got any results, to find out exactly why they had not come." T. at 738.

She eventually contacted Benson in January 1981:

"A ... And he suggested at that time that we cancel the orders placed with Hawes Office Systems and reorder, so I can be assured to receive them; not to give me a reason why, but just I wanted to receive the equipment." T. at 739.

The merchandise finally arrived in February 1981. Again, during the interim, Hawes furnished a terminal gratis.[3]

■ The evidence from these witnesses compels the conclusion that Wang's representatives breached their obligation to process Hawes' orders and to credit it with the sales. Apart from testimony which merely reiterated the official Wang position, defendant offered no evidence to explain away plaintiff's convincing evidence of breach as merely, for example, the clerical errors incident to conducting a large enterprise. Moreover, as evidenced from prior proceedings, Wang erroneously believed that the agreement had terminated in and of itself before January 25, 1981. Plaintiff's evidence confirmed that Wang had acted upon this erroneous belief. In light of the evidence, Wang contends that it was entitled to terminate Hawes pursuant to § 7(b) of the agreement because Hawes had breached several provisions.

■ In Massachusetts, cases occur in which each party to a contract violates it and each is liable in damages to the other. *Minot v. Minot,* 319 Mass. 253, 66 N.E.2d 5, 15 (1946). Nevertheless, "[i]t is well established that a material breach by one party excuses the other party from further performance under the contract." *Ward v. American Mutual Liability Ins. Co.,* 15 Mass.App. 98, 443 N.E.2d 1342, 1343 (1983) (citations omitted).[4] The Court's determination of this issue focuses on whether Hawes' breach was so material under all of the circumstances as to have justified Wang's actions. *Center Garment Co., Inc. v. United Refrigerator Co.,* 369 Mass. 633, 341 N.E.2d 669, 673 (1976).[5]

■ Defendant sought to show that Hawes' "abuse" of Wang's logo on the Hawes letterhead and stationery violated §§ 5.2 and 5.13 of their agreement:

"§ 5.2 Agent shall use only advertising material, product brochures, technical descriptions, and other material descriptive of Products prepared and supplied or ap-

---

**3.** An additional witness, Major Larry Doyle of Fort Totten in Bayside, Queens, had recommended that the Army rent a word processing system. When the necessary paper work was completed in September 1980, Doyle contacted Wang's Long Island office and was directed to Benson. He asked about Hawes, whom he had first met in 1979 and was told to deal through Benson.

**4.** This well recognized principle of contract law derives from any of several theories depending on the facts of the case. *Gentry v. Smith,* 487 F.2d 571, 575 (5th Cir.1973) (Fla. law) (theory of rescission by mutual consent inferred from the parties' conduct); *Westinghouse Electric Corp. v. Garrett Corp.,* 601 F.2d 155, 158 (4th Cir.1979) (Md. law) ("Second, under both Maryland law and general contract law, courts have held that in some instances where both parties are at fault (or in default) neither may recover.");

*Royce v. Rymkevitch,* 29 A.D.2d 1029, 289 N.Y. S.2d 598, 601 (3rd Dept.1968) ("It is well known that where one party refuses to abide by the contract, and that refusal is not justified by the actions of the other party, the other party does not have a duty to continue his performance under that contract (Restatement, Contracts, §§ 266–90); *Automotive Devices Co. v. Automotive Devices Co. of Pennsylvania,* 292 F.2d 663, 665 (3rd Cir.1961) (Pa.law) ("The rule in Pennsylvania and elsewhere is that when parties to a bilateral contract each commit a material breach thereof the law will give relief to neither party.").

**5.** As the Court makes clear in *Center Garment Co.,* this is a factual issue, resolved in this case by the Court. *Accord Randall v. Peerless Motor Car Co.,* 212 Mass. 352, 99 N.E. 221, 228–29 (1912).

proved by Wang; such material shall be ordered in quantities deemed reasonable by Wang, and Wang reserves the right of refusal."

"§ 5.13 Agent has no authority to and shall not represent itself as authorized to enter into any contract, obligation, or undertaking of any nature on behalf of Wang except specifically as authorized in this agreement. . . ."

The cross-examination of Hawes fell far short of establishing any abuse of Wang's logo. Recalling a conversation with Doretti about the use of a business card, Hawes pointed out to him that

"I sell Wang equipment. This is my name. I realize it's different from his testimony and I recall what his testimony was. But we have the words Hawes Office Systems down here and I pointed out that difference to him.

"Q Did you understand him to be expressing dissatisfaction with your use of the logo?

"A My understanding is that I pointed out the difference to him and he told me the words to the effect that he is going to check with his legal department." T. at 377.

"Q Did he express any concern that the buying public might misconstrue you as an employee representative of Wang Laboratories?

"A Mr. Owen, during that period of time—

"Q Excuse me, sir, in your conversations with Mr. Doretti at the conversations did he express that concern?

"A He may well have.

"Q You don't know one way or another?

"A No. I assume that is what he was talking about at the time; the concern that people would mistake us for Wang.

"Q And the area vice president of Wang, talk to him, the express[ion] of your dissatisfaction of the logo, did you immediately cease using the Wang logo on your stationery and business cards?

"A Mr. Owen, you are—

"Q Mr. Hawes, did you?

"A No, I didn't.

"Q You didn't, all right. Why didn't you do so?

"A Mr. Owen, I think it's common business practice for people who sell a name product to be able to identify the product that they sell." T. at 378–79.

The Court finds no breach of these provisions. To the extent that some of Hawes' customers may have held mistaken impressions, which seems unlikely because Hawes' customers also complained to Hawes when merchandise was late, Wang accepted the benefits, *i.e.,* the sales produced from Hawes' efforts. It was in a poor position to complain about the fruits of Hawes' effective marketing strategy and support services.

■ Defendant next contends that by billing customers directly, Hawes substituted its credit for the customer's contrary to §§ 5.3 and 5.5:

"§ 5.3 Agent shall submit orders for Products only on standard Wang contracts and will conform to Wang terms for purchase or rental."

"§ 5.5 All customer orders submitted by Agent are subject to approval by Wang, and approval will be based upon credit standards, administrative procedures, and service policies of Wang."

To the extent that direct billing may be deemed contrary to § 5.5, the Court finds that the breach was immaterial. Wang alludes to conversion but does not clearly identify what Hawes converted and does not claim that it was saddled with bad accounts or that Hawes' customers owed it money.

Wang also contends that direct billing was implicitly contrary to § 4.1:

"4.1 The sole compensation of Agent under this Agreement shall be the percentage of revenue specified hereafter received by Wang from the sale or rental of products installed within territory by Agent."

Again, it does not explain the import of this assertion nor identify what it lost. *Cf.*

*C.R. Bard, Inc. v. Medical Electronics Corp.,* 529 F.Supp. 1382, 1387 (D.Mass. 1982).

The totality of the circumstances—the termination letter of March 31, 1980, the subsequent negotiations of May 1980, the interference with plaintiff's accounts which followed, and Wang's acceptance of the agreement's benefits—further suggests that Wang's complaints about Hawes' conduct are makeshift. Contrary to Wang's implicit argument, this is *not* a case where " '[t]he court must let the chips lie where they fall.' Corbin, *Contracts* (1960 ed.) § 598, p. 589." *United States v. Hamilton Enterprises, Inc.,* 711 F.2d 1038, 1048 (Fed. Cir.1983). Accordingly, judgment will be directed for plaintiff on its breach of contract claim.

Turning to the question of damages, Hawes' theory is expressed as follows:

"The damages suffered by the Plaintiff in this case arise from sales that could have been made but were not made by Plaintiff because of the interfering acts of Defendant. The lost sales arise from refusing to allow Plaintiff to sell to material or major customers such as Equitable Assurance, Chase Manhattan Bank, Pan American Airlines and others. They also arise from refusal of Defendant to permit Plaintiff to sell to foreign customers based in the United States, for shipment overseas, such as the aborted British Airways sale. These were major sale losses which have to be added to the normal small-account sales which were prevented by Defendant. In addition, the commissions determined by paragraph 5 of the addendum, were withheld by Defendant."

Brief at 32–33.[6]

In support of that theory, plaintiff offered the testimony of William Bauer, its salesman and demonstrator, who related instances in which Wang representatives had intervened after he had developed the account. He approached Olsten Corporation, a temporary office help service in Westbury. They were interested in a $25,-000 system which they eventually bought from Wang in Manhattan. Bill Simmons, who worked for Wang in Manhattan, had taken the order and told Bauer that Hawes was not an authorized representative. This instance resembled the events of Equitable Life wherein Hawes' efforts were channeled into the making of a purchase from Wang in Manhattan through the customer's Manhattan office. Yet a third example was Seaview Hospital in Staten Island, which placed an order through the Hospital Corp. of the City of New York. Tom Voorhies, who handled the transaction in Manhattan, told Bauer to stay away from this account. Bauer also referred to the Chase Manhattan Bank in Lake Success; but in this case, Hawes had told him not to solicit there because the account was being handled by Manhattan.

The National Bank of North America in Melville was interested in at least $300,000 in equipment; however, the package required special engineering which only Wang could provide and which it declined to furnish. Bauer offered no evidence about the profitability of this proposal. Bauer had also approached the New York City Board of Education in Brooklyn but was not sure whether it ever actually purchased equipment ("minimum of $500,000") in which it had expressed interest.

The list continued. Opportunity Industrialization Center located in Brooklyn, Queens, the Bronx, and Manhattan, bought an estimated $100,000 worth of equipment;

---

**6.** Paragraph 5 of the addendum provides:

"Agent will be compensated at the following rates for the sale or installation of equipment in different territories.

Sale or rental of equipment by Agent to account within territory for installation in another territory: Commission Rate 50% to 33½% of agent's normal commission depending on contribution of Sales Representatives in territory of installation.

Sale or rental of equipment by Wang Sales Representative to account within territory covered by Agent: Commission Rate 50% to 66⅔% of agent's normal commission rate depending on contribution of Agent to sales effort."

again no credit was given to Hawes. Merrill Lynch of Huntington cancelled an order because delivery was not on time. Again, Bauer talked to a sales representative in Manhattan and learned that the purchase order went through the Manhattan office.

Bauer also sold a $14,000 rental and maintenance package to Farberware in the Bronx, a total of $22,000 to a hospital at Columbia University, and $11,305 to the State University of New York at Stony Brook. The commission on this last sale went to a Wang Long Island sales representative. Perhaps the largest of this category of customers was British Overseas Airways Corp., which, by telex, expressed an intention to purchase upwards of $1,000,000 in equipment from April 1, 1979 to March 31, 1982. At least one of these sales would have been $95,000 cheaper in the United States based on Bauer's quotations; however, Wang vice-president Doretti referred the sale to Wang's London office. Although plaintiff admits that it abandoned specific claims for commissions, T. at 1278, it highlights this evidence to emphasize the existence of tangible losses flowing from the defendant's breach of contract.

Defendant responds that, if the Court finds a breach of contract, all damages based upon interference have been abandoned. As plaintiff's admission and the remainder of defendant's arguments attest, this observation is beside the point. Wang vehemently contests, as "speculative", Hawes' proposed formula for using evidence of the business' past health to project its sales in the future, *i.e.*, during the period of the breach of contract in 1980. The Court turns first to a review of the governing principles of Massachusetts law.

"Prospective profits may be recovered in an appropriate action when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty. They need not be susceptible of calculation with mathematical exactness, provided there is a sufficient foundation for a rational conclusion. But such damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty. The nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts. When the elements, upon which the claim for prospective profits rests, are numerous and shifting contingencies whose relation to the wrong complained of is problematical, and such profits are not provable with assurance as a trustworthy result of the alleged cause, then there can be no recovery. Manifest ambiguities in ascertaining what would have been the course of events in the face of complicated factors, under circumstances which never have come to pass, and inherent difficulties in calculating the amount of prospective gains, prevent the recovery of damages. Pure chances lying between the alleged wrong and the anticipated profits, dependent upon unsettled conditions, render impracticable the assertion of cause and effect."

*Lowrie v. Castle*, 225 Mass. 37, 113 N.E. 206, 210 (1916) (citations omitted); *accord John Hetherington & Sons, Ltd. v. William Firth Co.*, 210 Mass. 8, 95 N.E. 961, 964 (1911) (The profits "must be capable of ascertainment by reference to some definite standard, either of market value, established experience, or direct inference from known circumstances."); *Randall v. Peerless Motor Car Co.*, 212 Mass. 352, 99 N.E. 221, 229 (1912) ("There may be elements which can be determined only by approximation, and which may be in some degree contingent or matter of opinion; and yet the damages as a whole may be measured by a standard as definite as that by which in the nature of things courts and juries must be guided in reaching results in many instances.").

As the cited cases demonstrate, each case in this area turns upon the fact finder's unique view of the evidence. *John Hetherington & Sons, Ltd., supra* ("A

comparatively insignificant incident may be in such combination with others as to lead to a conclusion in one decision apparently at variance with that reached in others. Each case must be decided on its own facts under this necessarily somewhat broad and comprehensive proposition."); *Rombola v. Cosindas*, 351 Mass. 382, 220 N.E.2d 919, 922 (1966) (same).

> "So far as the plaintiff can show by reasonable proof that he has lost profits he can have them included in the damages, and that is so even if there is beyond that line a penumbra which he cannot clear up. And the real question on this part of the case is not whether he has proved all the profits which it may be conjectured he might have made, but whether he has shown by reasonable proof that at least he certainly has lost some profits by the breach and that a fairly accurate estimate may be made of this portion."

*Gagnon v. Sperry & Hutchinson Co.*, 206 Mass. 547, 92 N.E. 761, 763–64 (1910). These principles have been applied in the context of agreements to pay commissions. *E.g., Easter Paper & Box Co. v. Herz Mfg. Corp.*, 323 Mass. 138, 80 N.E.2d 484, 488–89 (1948); *Barry v. New York Holding & Construction Co.*, 226 Mass. 14, 114 N.E. 953, 954 (1917).

■ Although the past performance or profits of the business may be considered as evidence of the prospective profits had there been no breach of contract, *e.g., Jacobs v. Cromwell*, 216 Mass. 182, 103 N.E. 383, 384 (1913); *Orbach v. Paramount Pictures Corp.*, 233 Mass. 281, 123 N.E. 669, 670–71 (1919); *Barry, supra* ("The amount of his [agent's] earnings during nine months under the first contract might well be taken as a basis for determining what he could have earned under the second contract during the ten months during which he had a right to earn commissions under that agreement."); *J.H. Horne &*

*Sons Co. v. Bath Fibre Co., Inc.*, 272 F.2d 8, 11 (1st Cir.1959) (Mass. law), plaintiff cites no authority, and the Court has found none, to support enhancement of the award by a multiplier.

Plaintiff's extrapolation assumes too much from the outset. The Court agrees that plaintiff sold approximately $600,000, twice the quota, in the first year of the agreement, January 25, 1979 to January 25, 1980. The Court does not agree, however, that reasonable expectations forecast sales of double the $600,000 quota ($1,200,000) in the second year. To warrant such a forecast would require evidence which is not in the record. There is nothing to explain why Hawes would hire three additional sales people or why they would sell at the same rates as Wang's sales representatives. There was also nothing concrete to demonstrate a greater rate of sales growth in Hawes' territory. Hawes' proposed recovery would amount to a windfall stemming from the fact of the breach rather than its results. In emphasizing Wang's alleged wrongdoing, Hawes overlooks the fact that Wang was entitled to compete and is liable, not for that competition, but only for losses shown to have been caused by interference with customers developed by Hawes.

■ The record does not conclusively establish a date when these activities commenced; however, from all the evidence, and especially the termination letter of March 31, 1980, the Court finds that an anticipatory breach had begun at least as of that time. More likely, it had begun much sooner because Wang maintained that the events of the parties' relationship during the first year coupled with the terms of the agreement had resulted in no agreement during the second year; consequently, Wang could interfere and appropriate with impunity.[7] The Court has previously rejected this argument.

---

**7.** Plaintiff's exhibit 12, a memorandum dated December 14, 1979, written by Cliff Castle to Wang vice-president Doretti, hinted at what was to come:

"I have attached a memo from Joe Esposito, Branch Manager on Long Island, which reviews some of the problems we are having with George Hawes.

■ The net result of the parties' contentions persuades the Court to steer a middle ground between plaintiff's over-inflation and defendant's claim that no damages were proved. Plaintiff's recovery, using the first year of the agreement as a comparable measure, *Jacobs v. Cromwell, supra; Barry, supra; Rombola v. Cosindas, supra,* is the difference between the commissions plaintiff actually earned during the second year of the agreement and what the evidence reasonably suggests it would have earned had defendant abided by the agency agreement.

■ Even under this standard, defendant undoubtedly would contend that the record contains inadequate evidence to meet the required degree of proof. Where, as here, the difficulties in determining damages arise in large part from the defendant's conduct, a reasonable approximation will suffice. *National Merchandising Corp. v. Leyden,* 370 Mass. 425, 348 N.E.2d 771, 774 (1976); *see McKenna v. Begin,* 5 Mass.App. 304, 362 N.E.2d 548, 553 (1977); *see also Evans v. Yegen Associates, Inc.,* 556 F.Supp. 1219, 1234 (D.Mass.1982).

Exhibit DN reveals that Hawes' gross in 1979 was $561,400.[8] In 1980 it grossed a total of $342,433, a market share of 43.12%. Exh. DQ. The difference is $218,967. In 1980 Wang grossed $451,163, Exhs. CL and DQ, a market share of 56.88%. The record contains nothing to refute that but for the breach, Hawes would have realized at least part of the difference between the 1979 and 1980 grosses. The testimony reflected a good forecast for future sales, and undoubtedly, Hawes' superior support services and customer relations, as documented by the testimony, provided an edge on the competition. Consequently, the Court finds that Hawes' quota of $600,000 for the second year was realistic and would have been achieved; thus the difference between the 1979 and the 1980 amounts is $257,567.

Because Hawes would have realized $600,000 in 1980, its estimated percentage of the market for that year is 75.59% (Hawes' estimated sales of $600,000 divided by the total market of $793,596 ($342,433 + $451,163)). Therefore, the Court finds that, as a reasonable estimate of an annual rate for 1980, Hawes would have additionally grossed 75.59% of the difference ($257,567) between the 1979 and 1980 amounts or $194,585.

The agency agreement provided two rates of compensation—15% of the rental for leases and 25% of the purchase price for sales.[9] Exhibits DO and DP reveal a

"Our main mission is to sell computer products but W[ord] P[rocessing] is becoming much more important as the way into many of the larger companies. This effort is becoming more difficult because of competing with the Hawes Agency. The long term goal of the New York District is to cover our territory with Wang products sold by Wang Salesmen.

"George's agreement is a good interim measure but it must be reviewed immediately to prevent further conflicts with our own people. We are currently competing agressively [sic] against George and our own products. I recommend the following:

"1. Effective January 1, 1980 transfer the Hawes Agency responsibility to the New York District. It would be handled by our Long Island Branch Office.

"2. A meeting will be held as soon as possible between George Hawes, Joe Esposito and myself to develop a joint marketing plan to sell and support WP products on Long Island and the New York Boroughs, other than Manhattan (his territory). The territories are identical and effort is not duplicated.

"3. Support would not have to be duplicated but rather shared between Hawes and ourselves for maximum sales coverage. This would be implemented immediately.

"4. The marketing plan would include both small companies (Hawes would handle this exclusively) and larger companies which would allow us to offload some of our support requirements (and expense) to Hawes."

8. The figures refer to the word processing business in Hawes' territory. All figures have been rounded to the nearest dollar amount to facilitate the calculations. The differences are immaterial to the judgment.

9. The Court has not considered any potential revenue from the addendum, paragraph 5, *supra,* because there is no evidence from which to estimate just how much effort Hawes would have had to expend to engage any of the specified transactions. In part, a dispute over the amount of the commission inhered in the provision's language. In this circumstance, any estimate or projection of commissions upon trans-

sales/lease ratio of 82%/18% in 1979 and 94%/6% in 1980. Although Wang's activities may have artificially affected the 1980 ratio, its breach of the agency agreement entitles Hawes to the benefit of the doubt. Thus, plaintiff is entitled to a 25% commission upon 94% of $194,585 or $45,727 and a 15% commission on 6% of $194,585 or $1,751. The judgment is for plaintiff in the amount of $47,478.

Based upon a formula derived from the evidence, the Court has computed the damages in an effort to compensate Hawes fairly and reasonably for the loss caused by Wang. At the same time, the Court's formula avoids bestowing a windfall upon plaintiff whose agency agreement did not shelter it from competition by defendant.

## II.

On May 14, 1982, pursuant to a prior determination of the Court, Wang paid Hawes $72,600 in withheld commissions, those owed up until January 25, 1981. Hawes asks the Court to award interest on these commissions, a request which Wang has not addressed.

■ In Massachusetts, *see Morris v. Watsco, Inc.*, 385 Mass. 672, 433 N.E.2d 886 (1982), the wrongful delay in the payment of a sum of money gives rise to interest as an element of compensatory damages. *Perkins School for the Blind v. Rate Setting Commission*, 383 Mass. 825, 423 N.E.2d 765, 772 (1981); *Trustees of the Boston and Maine Corp. v. Massachusetts Bay Transportation Auth.*, 367 Mass. 57, 323 N.E.2d 870, 875 (1975). The relevant statute is Mass.Gen.Laws Ann. ch. 231 § 6C, and *In re Medico Associates, Inc.*, 23 B.R. 307, 316 (Bkrtcy.D.Mass.1982), explains the method of computation. The Court finds that plaintiff is entitled to simple interest upon the $72,600 in commissions to accrue as such commissions became due.[10] Accordingly, the parties are

ordered to submit a proposed judgment wherein they have set out the amount of each individual commission covered by the lump sum payment, the date it became due under the agency agreement, and the amount of interest allocable thereto under the relevant statutory rate up until May 14, 1982, the date Wang paid the $72,600. The proposed judgment shall be submitted within 30 days of the date of this order.

## III.

The last issue concerns § 10 of the agency agreement:

"In the event that any dispute arising out of this Agreement is litigated between the parties hereto, the prevailing party shall be entitled to recover its reasonable attorney's fees in addition to any other relief to which it may show itself entitled."

Hawes contends that it is a prevailing party by virtue of having recovered $72,600 in commissions. Wang does not respond, but instead contends that it is a prevailing party because by stipulation and order of May 18, 1982, it recovered $42,000 on a counterclaim and because prior to trial, the parties stipulated to dismissal of several of plaintiff's claims.

■ The Court interprets § 10 to include litigation on appeal. Consequently, the Court will not be able to determine the "prevailing party" under the agreement until the appeal, or the time in which to pursue it, has been exhausted. The parties' requests for attorneys fees are thus premature.

The parties shall submit proposed judgments in accordance herewith within thirty (30) days from the date hereof.

SO ORDERED.

---

actions that never occurred would be completely speculative.

**10.** The Court would reach a similar conclusion under the law of New York. N.Y.Civ.Prac. Law

§ 5001; *see Shinki Boeki Co., Ltd. v. SS Pioneer Moon,* 378 F.Supp. 418, 419 (S.D.N.Y.1974), *affirmed on this point,* 507 F.2d 342, 346 (2d Cir.1974).