**L.G. BALFOUR COMPANY, INC., Plaintiff,**

v.

**Frank G. McGINNIS and American Awards & Gifts, Inc., Defendants.**

Civ. A. No. 90–1557 SSH.

United States District Court, District of Columbia.

Feb. 14, 1991.

J. Sedwick Sollers, James D. Miller, Washington, D.C., for plaintiff.

James R. Phelps, Mary Beth Neraas, Washington, D.C., for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on plaintiff's motion for a preliminary injunction. Upon consideration of the pleadings, the parties' oral arguments, and the entire record herein, the Court denies plaintiff's motion.

### Background

This is an action for breach of contract, breach of fiduciary duty, tortious interference, unfair competition, and injunctive relief enforcing a covenant not to compete in a contractual relationship. Plaintiff, Balfour Company (Balfour), manufactures jewelry, plaques, trophies, and other items which it sells to businesses and government agencies through its Recognition Products Group (RPG). Balfour also has a separate division, the Education Products Group (EPG), that sells school rings, diplomas, and other items such as school awards. Defendant Frank G. McGinnis worked as a salesman for Balfour's RPG division in the Washington, D.C., area from 1966 until 1990. Defendant American

Awards & Gifts (AA & G) is a corporation formed by McGinnis in April 1989, through which he now sells products similar to those he sold for Balfour. Balfour seeks a preliminary injunction preventing McGinnis and AA & G from competing against it in McGinnis's former territory.

This action has been bitterly fought. On the one hand, Balfour seeks to protect itself from competition from a skilled salesman who is familiar with its products and pricing. On the other hand, McGinnis is fighting to protect his very livelihood. In addition, each side appears to believe that its honor has been impugned. The parties, who once enjoyed a compatible and lucrative business relationship, now view each other with animosity and cannot agree on any of the material facts surrounding McGinnis's retirement from Balfour.

McGinnis began working as a sales representative for Balfour on July 1, 1966. At that time, he executed a Commercial Representative Agreement (Agreement) that assigned him to territory 22, the Washington, D.C., region.[1] The Agreement required McGinnis "to devote the whole of his time to servicing the assigned territory," to use his best efforts to promote the company's interests, and to sell only Balfour products. In addition, the Agreement contained a provision prohibiting McGinnis from selling "merchandise of the kind or character manufactured or sold" by Balfour for two years following the termination of the Agreement for any reason. Under the Agreement, Balfour supplied its prices to McGinnis, who then negotiated a sales price with customers. His "commission"

consisted of the difference between the price he negotiated with the customer and Balfour's base price to him. The customer paid Balfour directly, and Balfour deposited McGinnis's commission in a commission account on receiving full payment. Balfour treated McGinnis as an independent contractor and did not withhold income taxes from the commissions it paid him. McGinnis maintained his own office and paid his business expenses out of his commissions.[2]

In 1976, McGinnis and Balfour executed an amendment to the Agreement which provided that McGinnis would be entitled to the equity program in place at the time of his retirement. The parties executed a third instrument in 1985. This instrument was prompted by the retirement of another Balfour sales representative, Frank Shoaf, who had operated in the same territory as McGinnis since his original assignment to the Washington, D.C., area. The amended Agreement authorized Balfour to deduct amounts from McGinnis's commission account to make equity payments to Shoaf and correspondingly transferred "exclusive" rights to the territory to McGinnis. McGinnis emphasizes, however, that Balfour permitted Shoaf to form his own business, Balfour Supply Service. Through that business, Shoaf continued to sell Balfour products as well as products manufactured by Balfour competitors in the same territory as McGinnis. Balfour concedes that it did not enforce the covenant not to compete in Shoaf's contract and that it continued to sell products through him after his retirement. However, Balfour con-

1. The original Agreement referred to McGinnis's territory as number 22, but a 1986 Addendum stated that the territory should be designated territory 7. The territory included the District of Columbia, the surrounding counties in Maryland and Virginia, Southern Maryland, and part of West Virginia. Defendant would not agree to a map depicting the territory that plaintiff held up at the preliminary injunction hearing. However, the exact borders of the territory are not important for this decision.

2. Because Balfour treated him as an independent contractor for tax purposes, McGinnis disputes Balfour's characterization of the Agreement as an employment contract. Defendant's position is somewhat difficult to understand be-

cause some courts have scrutinized noncompete covenants in employment contracts closely on the assumption that the employee was at a disadvantage in negotiating the terms of the contract. *See, e.g., Wells v. Wells,* 9 Mass.App. 321, 400 N.E.2d 1317 (1980). Whether McGinnis was an employee makes no difference for the purposes of plaintiff's motion for a preliminary injunction enforcing the covenant not to compete. Balfour supplied the form contract and McGinnis clearly did not have leverage concerning its terms. Therefore, the Court treats the Agreement as an employment contract for the purpose of determining the enforceability of the noncompete covenant.

tends that Shoaf had developed such a strong relationship with several customers that it was in Balfour's best interest to allow him to continue to market Balfour products.

The parties address the nature of sales efforts in the recognition products industry at length. They disagree as to the most significant aspects of successful sales. Balfour stresses the fact that a salesman generally sells the idea of an employee recognition program to a potential customer. The customer and the salesman then design the employee recognition program, and the awards themselves, which Balfour then manufactures. The salesman, therefore, develops a relationship with the representative in charge of the recognition program at the customer corporation or government agency. The salesman is familiar with the cycle of the customer's award program and knows when to contact the customer regarding new orders. Finally, Balfour contends, the awards themselves are easy to manufacture and a salesman can order them readily from another manufacturer once he has the specifications. Balfour is vulnerable when a salesman leaves the company because the salesman possesses specific knowledge and a long-term relationship that enables him to work with a customer.

McGinnis minimizes the importance of special knowledge about customers. He maintains that customers often change suppliers and that a customer's main concerns are price, quality, and timely delivery of the product. He argues that Balfour has access to the customer's name, the contact person's name and the customer's phone number on each order sheet. This information is all Balfour needs to pursue its clients so that a former salesman has no special advantage based on his past dealings with customers. Defendant stresses

that much of his business involved government agencies which deal with the lowest bidder who can provide an acceptable product on time. Balfour concedes that government orders are unique because of the bidding requirement, yet maintains that McGinnis's familiarity with Balfour's pricing policy gives him an advantage in bidding. McGinnis answers that within the industry prices change frequently, therefore, his knowledge of Balfour's early 1990 prices is not a great advantage. Furthermore, he notes that Balfour provided its prices to Frank Shoaf after his retirement and presumably did not expect the price lists to enable Shoaf to compete more successfully with Balfour.

In September 1988, Town & Country, Inc., completed a takeover of Balfour. This buyout resulted in a change in management as well as several important policy changes within Balfour. The most significant change came in early 1989, when Balfour closed its RPG manufacturing facility in Attleboro, Massachusetts, and moved to a newer plant. As a result of this move, the RPG division began to suffer from late deliveries and lower quality products. McGinnis maintains that these problems were extremely severe and that late deliveries and poor quality caused him to lose his biggest customer, Marriott, which accounted for approximately $35,000.00 of his annual gross income.[3] McGinnis also states that he lost three other customers that generated another $10,000.00 of gross income annually.[4] Balfour concedes that some delivery problems arose from the move, but it contends that it quickly solved the problem through a "Vendor Drop Ship" (VDS) program. Through the VDS program, Balfour sales representatives could order products through Balfour-approved manufacturers. Thus, Balfour continued to make money through the

3. Balfour contends that the blame for losing Marriott's business was shared. Marriott's correspondence indicates that it was pleased with McGinnis himself but doubted Balfour's ability to continue to meet its needs. Perhaps this correspondence was merely a professional courtesy to soften the blow to McGinnis or to smooth out Marriott's last transactions with

Balfour. Nevertheless, Marriott's letter does indicate that Balfour and not McGinnis caused Marriott's dissatisfaction.

4. The three customers were the United States Department of Justice, the United States Marshals Service, and the American Advertising Federation.

sales and the sales representatives avoided the delivery delays from Balfour's own plant.

Balfour maintains that the VDS program corrected the major delivery problems within several months and that Balfour eliminated the problems entirely by November 1989. McGinnis contends, however, that the delivery and quality problems continued up to his retirement. McGinnis compiled a table that illustrates the delivery time of each of his orders from February 1989 to April 1990. At the preliminary injunction hearing, Balfour argued that McGinnis's statistics are misleading, as statistics often are. Balfour argues that, in the recognition products industry, the only real deadline for the delivery of awards is the date of the award ceremony. Thus, delivery past the customer's requested delivery date is not late so long as the delivery precedes the award ceremony. This argument does not stand up to common sense and to Balfour's own characterization of the recognition products industry. Balfour argues vigorously that customer goodwill is critical to its success. It is inconsistent to argue that the customer's desired delivery date is not important. Whether such a deadline is "real," missing it on a consistent basis certainly would erode customer goodwill. Furthermore, some leeway between delivery and the award ceremony is necessary to discover and correct any mistakes. McGinnis's table of statistics shows many deliveries weeks beyond the requested delivery date. Even if the majority of these delays did not cause a serious problem for the customer, the table suggests that Balfour's problems were more serious than it admits.

Early in the VDS program, Balfour learned from one of the participating manufacturers, Crest Craft, that McGinnis had placed an order directly with Crest Craft in April 1989. When Balfour questioned McGinnis about the order he acknowledged it, but McGinnis maintained that there was no other way to obtain delivery on time.

McGinnis offered to pay Balfour a royalty equal to the usual profit on such an order and requested permission to continue that arrangement on future orders. Balfour maintains that it never approved such dealings. Later in 1989, McGinnis approached another of Balfour's subcontractors, Kirk Stieff, and requested a direct line of credit for AA & G, which he had incorporated in April 1989. Again, Balfour became aware of the unauthorized contact, and again, it warned McGinnis about operating outside the approved VDS program.

In 1989, Balfour announced a new sales direction emphasizing "repeating program" corporate accounts. Balfour wanted to focus on corporate customers because they generally purchase high priced items. Balfour also indicated that it was not interested in new federal, state, or local government customers because they generally purchase inexpensive items. Consistent with this new direction, Balfour adopted a new policy regarding small orders. Balfour would no longer pay for artwork on orders for less than $2,500.00 and it would no longer accept any orders under $500.00. In a memorandum to its sales representatives, Balfour stated that the new policy would be flexible and urged the representatives to contact the regional vice president to work out any problems the policy might cause. The new policy threatened some of McGinnis's business with government agencies. His correspondence indicates that he attempted to contact the regional vice president to develop a compromise, but his calls were not returned.[5]

Balfour's management also sent McGinnis new sales goals for 1990 in October 1989. In the past, McGinnis had met his sales goals for several years and won bonus trips from Balfour. Balfour set the 1990 sales goals at $805,000.00 total sales and $200,000.00 new sales from corporate customers—sales to government agencies would not count toward meeting the new

---

5. McGinnis proposed that Balfour open a customer account in his name. He would then hold orders under $500.00 until he obtained a total order over that amount to submit to Balfour. It is not clear how Balfour responded to this suggestion.

sales goal.[6] In his best year, McGinnis had generated new sales of $125,000.00 including government agencies. The new corporate sales goal therefore was very high and, in McGinnis's mind, unrealistic. Balfour argues that the goals were set merely as an incentive and did not mark any mandatory minimum for which McGinnis could be fired.[7]

On April 1, 1990, McGinnis tendered his resignation to Balfour effective April 30. The resignation letter offered to introduce Balfour's new sales representative in territory 22 to Balfour's customers and to return Balfour's files and samples. In late April, Charles Pitts of Balfour came to Washington and asked McGinnis to sign a "Termination Settlement Agreement." McGinnis requested assurance that he would receive his back commissions and equity payments. Pitts refused to make such assurances and McGinnis refused to sign the Termination Settlement Agreement which he contends significantly altered his rights to equity payments.[8] McGinnis also refused to return the Balfour customer files until he received the back commissions and some assurance that Balfour would honor his equity agreement. In June 1990, Balfour discovered that McGinnis was selling recognition products through AA & G which he continues to do. AA & G uses the same office and telephone number that McGinnis used as a Balfour representative. McGinnis testified at his deposition that he changed the telephone listing to AA & G's name and that he directs any customers seeking Balfour products to the new Balfour representative.

Balfour filed this action in July 1990. Balfour claims that McGinnis violated the terms of the Agreement by selling non-Balfour products while he was still a Balfour sales representative and that McGinnis currently is competing with Balfour in his former territory in violation of the two-year noncompete covenant. Balfour also seeks an order requiring McGinnis to return the customer files which he has withheld. For his part, McGinnis denies that he and AA & G are in direct competition with Balfour and claims that Balfour breached its obligations under the employment contract making it impossible for him to continue as a sales representative. McGinnis counterclaims for back commissions that Balfour allegedly has not paid him and for contributions he made to Balfour's 401k plan. In addition, McGinnis claims that Balfour has indicated that it will not honor the equity agreement which entitles him to a percentage of the commissions generated in his former territory. McGinnis claims that he is entitled to withhold Balfour's customer files until he receives adequate assurance that Balfour will honor the equity agreement.

## Discussion

To prevail on a motion for a preliminary injunction, the plaintiff must demonstrate that the balance of four factors weighs in favor of granting the injunction. The four factors are (1) plaintiff's likelihood of success on the merits, (2) the potential for irreparable harm to the plaintiff if the injunction is not issued, (3) the balance of harm to the plaintiff and the defendant, and (4) the public interest. *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C.Cir.1984); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958).

---

**6.** Balfour originally set a new corporate sales goal of $350,000.00 for McGinnis but then reduced it to $200,000.00.

**7.** In his affidavit submitted in opposition to Balfour's motion for a preliminary injunction, McGinnis states that he thought he would be fired if he did not meet the new goals. This statement is clearly an exaggeration. However, McGinnis was justified in concluding that Balfour meant to alter his business significantly and that he would have to follow Balfour's new sales

direction to get along with the new management.

**8.** At the hearing, Balfour denied that the Termination Settlement Agreement altered the equity program. It stated that sales representatives received equity payments whether or not they signed the termination agreement. Balfour never fully explained the purpose of the termination agreement.

Balfour argues that it has a substantial likelihood of success on the merits of its claim that defendant is in violation of an enforceable covenant not to compete. Massachusetts law governs the Agreement and the covenant not to compete under the Agreement's choice of law provision. *See NRM Corp. v. Hercules, Inc.,* 758 F.2d 676, 681 n. 13 (D.C.Cir.1985) (contractual choice of law provision is enforceable provided it bears a reasonable relation to the contract); *Gray v. American Express Co.,* 743 F.2d 10, 16–17 (D.C.Cir.1984) (same). Under Massachusetts law, a covenant restricting competition is enforceable if it "is reasonably limited in time and space, and is consonant with the public interest." *Analogic Corp. v. Data Translation, Inc.,* 371 Mass. 643, 358 N.E.2d 804, 807 (1976); *Novelty Bias Binding, Co. v. Shevrin,* 342 Mass. 714, 175 N.E.2d 374, 376 (1961). Massachusetts courts will not invalidate an unreasonable noncompete covenant completely but will enforce it to the extent that is reasonable. *All Stainless, Inc. v. Colby,* 364 Mass. 773, 308 N.E.2d 481, 485 (1974); *New England Tree Expert Co., Inc. v. Russell,* 306 Mass. 504, 28 N.E.2d 997 (1940).

In *All Stainless, Inc. v. Colby,* 308 N.E.2d at 481, the Massachusetts Supreme Court enforced a covenant not to compete on facts similar to those before the Court. The defendant was a salesman for the plaintiff, All Stainless, which manufactured steel fasteners. The defendant left All Stainless for a competitor and All Stainless sought an injunction based on a two-year covenant not to compete in the defendant's employment contract. The *All Stainless* court noted that an employer ordinarily is not entitled to restrict competition from its former employees, but that an employer is entitled to protect its customer goodwill. *Id.* 308 N.E.2d at 486. A former employee may threaten the employer's goodwill "because the former employee's close association with the employer's customers may cause those customers to associate the former employee and not the employer with

products of the type sold to the customer." *Id.* The court found that the former salesman posed a threat to plaintiff's customer good will in his former territory because he had served as the company's principal contact with customers. The *All Stainless* court, therefore, granted a preliminary injunction enforcing the noncompete provision in the defendant's former territory but refused to bar the defendant from competing with the plaintiff outside his former territory. *Id.* 308 N.E.2d at 486–87. Balfour contends that the same factors weigh in favor of enforcing the covenant not to compete against McGinnis. It states that McGinnis "is Balfour" to the customers within his territory. McGinnis therefore can damage Balfour's customer goodwill in two ways: Balfour customers may deal with him mistakenly believing that they are still dealing with Balfour, and Balfour customers may choose to continue their relationship with him instead of remaining with Balfour.

Although Massachusetts law enforces reasonable covenants not to compete, it does recognize circumstances in which such covenants are excused. In *Ward v. American Mutual Liability Ins. Co.,* 15 Mass.App. 98, 443 N.E.2d 1342, 1343 (1983), the Massachusetts Appeals Court held that a material breach excuses a covenant not to compete.[9] This follows from the basic contract law principle that a material breach by one party excuses further performance by the other party. *Id.; see Center Garment Co. v. United Refrigerator Co.,* 369 Mass. 633, 341 N.E.2d 669, 673 (1976); *Petrangelo v. Pollard,* 356 Mass. 696, 255 N.E.2d 342 (1970). Every party to a contract has an implied duty of good faith and fair dealing under Massachusetts law. *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251, 1256–57 (1977); *Kerrigan v. Boston,* 361 Mass. 24, 278 N.E.2d 387, 393 (1972). In addition, there is an implicit condition that each party will cooperate with the

---

9. In *Ward,* 443 N.E.2d at 1343, the court held that the wrongful termination of two insurance salesmen excused a noncompete covenant in their employment contracts. The salesmen, therefore, were not barred from recovering damages for the wrongful termination despite the fact that they had competed with the former employer following the terminations. *Id.*

other's performance. *See Kerrigan*, 278 N.E.2d at 393; *Eaton v. Eaton*, 233 Mass. 351, 124 N.E. 37 (1919). Thus, Balfour had an implied obligation to cooperate with McGinnis's "best efforts" to promote its products. McGinnis argues that Balfour's delivery problems and its policy eliminating small orders constituted a material breach of Balfour's obligations under the contract and therefore excused the covenant not to compete. Balfour contends that the problems did not amount to a material breach and therefore that the covenant is enforceable.

The severity and duration of Balfour's delivery problems is not clear from the evidence. In all likelihood, the problems were somewhat less severe than McGinnis claims but more serious than Balfour admits. Clearly, the problems had a significant impact on McGinnis's income and his ability to operate as a Balfour sales representative. Because of Balfour's problems, McGinnis lost at least four customers that accounted for $45,000.00 of his annual gross income. One of those customers was his largest single account. In addition, the elimination of smaller orders threatened another $10,000.00 of annual income. At a trial on the merits, the factfinder could reasonably find that Balfour had breached its obligation to cooperate with McGinnis's best efforts to sell its products. Balfour therefore has failed to establish that its likelihood of success on the merits is substantial.

Balfour also has not shown that it will suffer irreparable harm if the Court does not issue a preliminary injunction. Balfour argues that the potential injury to its customer goodwill in the Washington, D.C., area from McGinnis's continued competition is incalculable and irreparable. McGinnis states that he has not misled any Balfour customers. He has directed any calls concerning Balfour products to Balfour. Furthermore, he contends that he is pursuing the type of accounts that Balfour indicated it no longer wanted, that is government customers that purchase lower priced items in smaller quantities than corporate customers. Balfour never denied that it had changed its focus to corporate accounts. The policy against accepting small orders evidences Balfour's desire to move away from the clientele that McGinnis had built up over 24 years. Balfour cannot have it both ways. It cannot simultaneously argue that the smaller accounts are not profitable and yet insist that McGinnis's long term relationship with the representatives in charge of those accounts is invaluable. Balfour has already rejected the customer goodwill that it invokes as a basis for enforcing the noncompete covenant. It appears that Balfour simply wants to ensure that McGinnis cannot have what it does not want. Therefore, Balfour has not demonstrated that it will suffer irreparable harm if the Court does not issue a preliminary injunction in its favor.

For the same reasons, Balfour has failed to establish that the balance of harm weighs in favor of granting the preliminary injunction. Balfour notes that the noncompete covenant and the requested injunction enforcing it are limited in scope to McGinnis's former territory and in duration to two years. Balfour contends that McGinnis may sell any other type of product within territory 22 or he may sell recognition products anywhere else in the United States. Therefore, Balfour argues, the noncompete provision is reasonable and the harm to McGinnis is minimized. Although in theory McGinnis could move his business or sell other products, the effect of the preliminary injunction would be to put him out of the business that he has pursued for 24 years. On balance, the potential harm to McGinnis from eliminating his livelihood appears greater than the potential harm to Balfour from allowing him to continue pursuing clients in which it had lost interest.

### Conclusion

■ Balfour has not demonstrated that the necessary factors weigh in favor of a preliminary injunction. Balfour's likelihood of success on the merits is not substantial. Although Massachusetts law enforces covenants not to compete in employment contracts, such covenants are excused by a material breach of the contract. McGinnis presented a strong argument

that Balfour in fact breached its obligations under the Agreement and forced him to retire or lose his livelihood. Furthermore, Balfour did not demonstrate that it would suffer irreparable harm during the pendency of this action. Because Balfour is no longer interested in many of the customers that McGinnis served, any injury to the goodwill of those customers is not a serious injury to Balfour. On the other hand, an order preventing McGinnis from selling recognition products in the Washington, D.C., area would injure him significantly. For these reasons the plaintiff's motion for a preliminary injunction is denied.